IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01237-DME-CBS

TAYLOR PROFITA,

       Plaintiff,

v.

CHRIS PUCKETT, in his capacity as an individual, and
JOHN AND JANE DOES 1 THROUGH 100 in their capacities as individuals,

       Defendants.

---

## RECOMMENDATIONS AND ORDERS ON PENDING MOTIONS

---

Magistrate Judge Shaffer

       This matter comes before the court for consideration of the following motions: (1)

Defendant Chris Puckett's Motion for Summary Judgment (doc. # 93), and (2) Plaintiff Taylor

Profita's Motion for Summary Judgment (doc. # 95). These motions were referred to this

Magistrate Judge for findings of fact and recommendations pursuant to a memorandum dated

February 6, 2017, and both are fully briefed.[1] The court has carefully considered the parties'

---

[1]During a hearing on March 28, 2017, this court denied Plaintiff's Motion to Vacate
Defendant's Response to Plaintiff's Motion for Summary Judgment (doc. #113). Mr. Profita's
motion argued that the Response had been filed three days late. Defendant's counsel explained
that the delay was attributable to "a calendaring error in the wake of the recent rule change that
eliminated the 'three-day rule' for electronic service." *See* Defendant's Response to Plaintiff's
Motion to Vacate (doc. #115). While Plaintiff is correct – Defendant did file his Response after
the proper due date – I found that any possible prejudice that Mr. Profita might have suffered
was better cured by allowing him to file a reply brief, which he did on April 10, 2017. *See*
Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (doc.
#133). *Cf. Kazmierski v. Bonafide Safe & Lock, Inc.*, No. 15-cv-0059, 2016 WL 7187321, at *13
(E.D. Wis. Dec. 9, 2016) (although the court found that defendant's summary judgment

briefs and attached exhibits, and the entire case file.  I also have spent considerable time

conducting my own legal research.  For the sake of simplicity, these Recommendations will

address the summary judgment motions in the order in which they were filed.

Also pending before the court are the following referred motions:  (3) Plaintiff Profita's

Motion to Quash Subpoenas (doc. #81); (4) Plaintiff Profita's Motion for Immediate Recusal of

Magistrate Judge (doc. # 127); and (5) Plaintiff Profita's Motion to Stay Proceedings Related to

Defendant's Motion for Summary Judgment (doc. #127).  Plaintiff's Motion to Quash addresses

subpoenas directed to health care providers who have treated Mr. Profita in the past.  After this

motion was fully briefed, I elected to defer my ruling pending the disposition of the parties'

---

submission was filed three days after the deadline because of defense counsel's error, neither the
plaintiff nor the court was prejudiced by that delay; for that reason, the court declined to strike
the late filing); *Mandy's Ltd. v. Salon & Beauty Source, Inc.*, No. 15-cv-01571-WYD-MJW,
2016 WL 1223061, at *2 (D. Colo. Mar. 29, 2016) (while noting that the plaintiffs' summary
judgment response brief was filed three days late, the court concluded that defendant had not
suffered any significant prejudice; the court further found "that a manifest injustice would result
if Plaintiffs were not allowed to file such a response"); *Self v. Lansing Unified Sch. Dist. No.
469*, No. 13-2487-KHV, 2014 WL 6678632, at *2 (D. Kan. Nov. 25, 2014) (although plaintiffs'
failure to file their summary judgment response until three days after the deadline had passed
would not support a finding of excusable neglect, the court allowed the untimely filing "to
ensure that plaintiffs do not suffer from counsel's mistakes").  I also explained during the March
28, 2017 hearing that striking Defendant's untimely Response would not alter the court's
obligation under Fed. R. Civ. P. 56.  Summary judgment may not be granted simply because the
non-moving party failed to file a response.  *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th
Cir. 2002).  "[S]ummary judgment is 'appropriate' under Rule 56(e) only when the moving party
has met its initial burden of production under Rule 56(c).  If the evidence produced in support of
the summary judgment motion does not meet this burden, 'summary judgment must be denied,
*even if no opposing evidentiary matter is presented*.'" *Id.* at 1194 (emphasis in original) (citing
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).  Moreover, "[w]hen opposing parties both
seek summary judgment . . . [t]he court rules on each motion separately, determining in each
case, whether a judgment may be entered in accordance with Rule 56." *Garrison Prop. & Cas.
Ins. Co. v. Rickborn*, No. 2:15-cv-4379-PMD, 2016 WL 7451133, at *1 (D. S.C. Dec. 28, 2016).
In the end, this case should be decided on the facts and the pertinent legal authorities, not on
hyper-technicalities or sharp elbows.

motions for summary judgment.  I concluded that it would be wholly inappropriate to burden

non-parties with the obligations of discovery if the requested information might prove to be

wholly superfluous.  Mr. Profita and defense counsel agreed with that assessment during a

discovery conference on February 10, 2017.  *See* doc. #101.

Plaintiff's motion to recuse and motion to stay proceedings were referred to this court in

an Order (doc. # 135) issued by the district court on April 20, 2017.  For reasons that will be

explained below, I do not believe these two motions require further briefing.

## PROCEDURAL BACKGROUND

Mr. Profita, a former student at the University of Colorado School of Medicine, filed his

*pro se* Complaint[2] on June 11, 2015, alleging three claims for relief:  (1) "false police report and

false report of a lawful exclusion of Profita from the Anschutz Medical Campus;" (2) "the

unlawful issuance of an allegedly exclusionary order issued in violation of Profita's Due Process

rights;" and (3) "the unlawful prohibition of Profita from contact with public employees and

officials from the University of Colorado and the University of Colorado School of Medicine."

In sum, Plaintiff asserts that he has property and liberty interests and rights "to be present on

campus" and "in working with, interacting and corresponding [with] public officials, colleagues

and staff at the Anschutz Medical Campus, the University of Colorado School of Medicine and

affiliated programs."  Mr. Profita contends that the "unlawful issuance of an exclusionary order

and the arbitrary prohibition of conduct" deprived him of the aforementioned constitutional

rights without due process.  The Complaint names as defendants Chris Puckett in his individual

---

[2]This pleading consists of 22 pages and 143 numbered paragraphs.

capacity, and John and Jane Does 1 through 100 in their individual capacities.[3] Defendant

Puckett filed an Answer (doc. #14) on July 27, 2015. After the close of discovery on December

16, 2016, the parties filed the motions for summary judgment that are the subject of this

Recommendation.

## ANALYSIS

I.    *Defendant's Motion for Summary Judgment*

"Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where the [materials in the record, including] . . . depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter

of law." *Montgomery v. Bd. of County Comm'rs*, 637 F. Supp. 2d 934, 939 (D. Colo. 2009)

(internal quotation marks and citations omitted); Fed. R. Civ. P. 56(a).

The burden of persuasion under Rule 56 requires the moving party to "point to those

portions of the record that demonstrate an absence of a genuine issue of material fact, given the

relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024

(10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A fact is

---

[3]As for the Doe Defendants, there is no provision in the Federal Rules of Civil Procedure for the naming of fictitious or anonymous parties in a lawsuit. *Watson v. Unipress, Inc.*, 733 F.2d 1386, 1388 (10th Cir. 1984); *Coe v. U.S. Dist. Court for Dist. of Colo.*, 676 F.2d 411, 415 (10th Cir. 1982). To the contrary, the Federal Rules provide that in a complaint "the title of the action shall include the names of all parties . . . ." *See* Fed. R. Civ. P. 10(a). Anonymous parties are not permitted by the Federal Rules, and Mr. Profita has not identified who is or might be subsumed under the heading "John and Jane Does 1 through 100." I also note that the deadline for joinder of parties in this action passed long ago without any affirmative action by Mr. Profita. *See* Scheduling Order (doc. #46). Defendants John and Jane Does 1 through 100 are properly dismissed from this civil action.

"material" if under the substantive law it could have an effect on the outcome of the lawsuit. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986)). While the moving party bears the initial burden of showing that there is an absence of any issues of material fact, *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991), the movant need not negate the non-movant's claim. *See John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 503 (10th Cir. 1994); *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994). Once the moving party points to an absence of evidence to support the non-moving party's claim, the non-moving party may not rest upon his pleadings, but must come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's case. *See* Fed. R. Civ. P. 56(e). *See also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

To defeat a defendant's properly supported motion for summary judgment, there must be evidence upon which the jury could reasonably find for the plaintiff. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). Conclusory allegations alone will not create a genuine issue of material fact necessitating trial. *Dobson v. City & Cty. of Denver*, 81 F. Supp. 2d 1080, 1083 (D. Colo. 1999), *aff'd,* 13 F. App'x 842 (10th Cir. 2001). *Cf. Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990), *rehearing denied* (Jan. 29, 1991) ("conclusory allegations without specific supporting facts have no probative value"). Similarly, evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment. *Ayon v. Gourley*, 47

F. Supp. 2d 1246, 1252 (D. Colo. 1998), *aff'd,* 185 F.3d 873 (10th Cir. 1999). The

demonstration of "some metaphysical doubt as to the material facts" is not sufficient to establish

a genuine issue of material fact. *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957 (7th Cir.

1997) (quoting *Matsushita*, 475 U.S. at 586).

After construing the factual record and drawing all reasonable inferences therefrom in the

light most favorable to the non-moving party, *Kidd v. Taos Ski Valley, Inc*., 88 F.3d 848, 851

(10th Cir. 1996), *rehearing denied* (Sep. 5, 1996), the court ultimately must determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "The

very purpose of a summary judgment action is to determine whether trial is necessary." *White v.

York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

In addressing the pending motions and related briefs, I recognize that "a pro se litigant's

pleadings are to be construed liberally and held to a less stringent standard than formal pleadings

drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v.

Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a

pro se litigant, including . . . summary judgment proceedings." *Hall*, 935 F.2d at 1110 n. 3

(citations omitted). "[S]uch liberal construction is intended merely to overlook technical

formatting errors and other defects in Plaintiff's use of legal terminology and proper English."

*Smith v. Krieger*, 643 F. Supp. 2d 1274, 1279 (D. Colo. 2009) (citation omitted). The court

cannot be a pro se litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir.

2008).

A.     The Undisputed Facts

In addressing a motion for summary judgment, the court's initial focus must be on those facts that "cannot be or [are] genuinely disputed" as evidenced by citations to "particular parts of materials in the record." *See* Fed. R. Civ. P. 56(c). After carefully reviewing the exhibits proffered by the parties in connection with briefing the competing motions for summary judgment, the following facts and/or events appear to be undisputed.[4]

In 2012, Mr. Profita was a third-year medical student at the University of Colorado School of Medicine. In August 2012, he commenced a *pro se* civil action in the District Court for Adams County, Colorado asserting claims against the University of Colorado School of Medicine for breach of contract and promissory estoppel, and requesting permanent injunctive relief.[5] By the time Mr. Profita's case proceeded to a three-day bench trial on May 6-8, 2013, he had been dismissed from the School of Medicine based upon failing grades in his "Hospitalized Adult Care" clinical rotation and Women's Care rotation.[6] On May 14, 2013, the Adams County

---

[4]Although the parties included many of the same documents as exhibits to their respective briefs, in some instances they offer decidedly different interpretations of those documents.

[5]That injunctive relief would have required, *inter alia*, the Medical School to enter passing grades on the two clinical rotations at issue and "enter a grade of pass for the courses in the third and fourth years of medical school into which [Mr. Profita] was not allowed to enroll." Mr. Profita further asked that the University be enjoined from dismissing him from the MD program and "from negatively influencing his academic performance and/or professional progress or future." *See* Exhibit C (doc. #93-3), attached to Defendant's Motion for Summary Judgment.

[6]On January 3, 2013, the Dean for the School of Medicine sent Mr. Profita a letter of dismissal for "unsatisfactory academic performance." *See* Exhibit 10 (doc. #107-10, at ¶ 33), attached to Plaintiff's Response to Defendant's Motion for Summary Judgment. Mr. Profita apparently concedes that he was dismissed from the School of Medicine for academic reasons, but vigorously disputes the alleged justification for his termination. *See, e.g., Profita v. Regents of the Univ. of Colo.,* No. 16-cv-03032-RBJ, 2017 WL 1023379, at *4 (D. Colo. Mar. 15, 2017)

District Court entered judgment "in favor of the defendant University of Colorado School of

Medicine and against plaintiff Taylor Profita."[7]  *See* Exhibit C (doc. #93-3), attached to

Defendant's Motion for Summary Judgment.[8]  In particular, the Adams County District Court

found that Mr. Profita had not established all of the essential elements of his breach of contract

and promissory estoppel claims.  The court further found that "[r]estoring Mr. Profita to medical

school would adversely affect the public interest."  *Id.*  On August 28, 2014, the Colorado Court

of Appeals affirmed the judgment against Mr. Profita.  *See Profita v. Univ. of Colo. Sch. of*

---

(in dismissing Mr. Profita's request for relief under Title II of the Americans with Disabilities Act, the district court observed that "after [Mr. Profita] was already given a second chance to retake the clinical courses, plaintiff claims that he requested that the University ignore his past poor academic performance and reinstate him as a student;" "[s]uch request, however, is not so much an *accommodation* of a disability as it is an *absolution* for problems caused by one") (emphasis in original).

[7]In referring to Mr. Profita's prior lawsuit against the University of Colorado School of Medicine, this court offers no opinions regarding the merits of Mr. Profita's claims in that action or the decisions rendered by the Adams County District Court or the Colorado Court of Appeals. I simply include those facts to place this lawsuit and Mr. Profita's current claims in historical context.

[8]Judge Moss' Findings of Fact, Conclusions of Law and Judgment specifically references Dr. Zehnder, the Clinical Director/Course Director of the Hospitalized Adult Care clinical rotation, as well as the Director of the Remediation and Individualized Learning Plans, Dr. Guerrasio.  *See* Exhibit C (doc. #93-3) at pp. 7-10, attached to Defendant's Motion for Summary Judgment.  On January 29, 2016, Mr. Profita tendered a proposed Amended Complaint (doc. # 32) in this action that would have joined Drs. Zehnder and Guerrasio, among others, and asserted claims against them for, *inter alia*, violations of the Colorado Organized Crime Control Act. More particularly, Mr. Profita alleged in his proposed Amended Complaint that during the trial before the Adams County District Court, Drs. Zehnder and Guerrasio offered perjured testimony regarding their interactions with Plaintiff as a medical student.  On July 5, 2016, this court recommended that Plaintiff's motion for leave to file an amended complaint be denied without prejudice.  *See* Recommendation Regarding Plaintiff's Motion to Amend (doc. #38).  Thereafter, Plaintiff filed a Response and Objections to the Court's Recommendation Regarding Plaintiff's Motion to Amend (doc. # 39).  After Defendant Puckett was forced to incur the expense of filing a Response (doc. #40) to that Response and Objections, Mr. Profita "agree[d] to withdraw his current motion for leave to amend" on August 8, 2016.  *See* the District Court's Order Denying as Moot Plaintiff's Motion for Leave to Amend Complaint (doc. #42).

*Medicine*, No.13CA1095, 2014 WL 4248613 (Colo. App. Aug. 28, 2014) and Exhibit D (doc.

#93-4), attached to Defendant's Motion for Summary Judgment.  Mr. Profita's petition for writ

of certiorari was denied by the Colorado Supreme Court on April 30, 2015.  *See Profita v. Univ.*

*of Colo. Sch. of Medicine*, No.14SC824, 2015 WL 1812936 (Colo. Apr. 20, 2015).

On May 16, 2013, Defendant Puckett, in his capacity as Senior Assistant University

Counsel, sent Mr. Profita an email[9] reminding him that:

> because you are no longer a student you are not to be on campus except if/when
> you are receiving medical care and treatment.  You are not to contact any of the
> faculty involved in person, mail, or by e-mail.  If you need to contact anyone with
> a question or issue with the University, other than for medical care/treatment,
> please work through me or David Temple.  If you violate either of these
> conditions, then the University may proceed to formally exclude you from
> campus.

*See* Exhibit 14 (doc. 95-14), attached to Plaintiff's Motion for Summary Judgment.[10]  *See also*

Exhibit E (doc. #93-5), attached to Defendant's Motion for Summary Judgment.

Mr. Profita visited the Anschutz Medical Campus on June 12, 2013, and was seen by

Defendant Puckett entering Building 500.[11]  Mr. Puckett was aware that "[d]uring the Adams

---

[9]Mr. Puckett sent this email two days after the Adams County District Court entered
judgment against Mr. Profita.

[10]Mr. Profita has acknowledged that he received Mr. Puckett's May 16, 2013 email and
was aware that his on-campus presence was limited to medical care and treatment.  *See* Exhibit I
(doc. #112-9) (Deposition Transcript of Taylor Profita, at p. 146:2-16), attached to Defendant's
Response to Plaintiff's Motion for Summary Judgment.  During the same deposition, Mr. Profita
testified that while he didn't "ignore" Mr. Puckett's email, he "just assessed it, evaluated it, and
didn't put much stock into it."  *Id.* at p. 133:1-18.

[11]The website for the University of Colorado School of Medicine describes Building 500
as the location of "the Chancellor's Office, central services and administration, administrative
offices for the University of Colorado School of Medicine, as well as the Child Health
Associate/Physician's Assistant program, the University of Colorado Cancer Center, the
Colorado School of Public Health, CU outpatient psychiatric clinics, the Office of Advancement,
and the campus bookstore."  The website also indicates that the Anschutz Medical Campus

County litigation, some faculty and administration felt concerned about Plaintiff's conduct and had concerns about their personal safety due to Plaintiff's behavior before and during the litigation." In the aftermath of the state court litigation, Mr. Puckett had been "asked by School of Medicine faculty and administration to direct Plaintiff not to contact them; and for Plaintiff to restrict his visits to campus for medical or psychiatric treatment only." *See* Exhibit B (doc. #93-2), attached to Defendant's Motion for Summary Judgment.[12]

Defendant Puckett does not dispute that on June 12, 2013, he contacted the University Police Department to report his observations and advise the University Police that Mr. Profita was not permitted on campus except for medical reasons.[13] *Id.* An official report described

---

Student Mental Health Service is located on Level 2 of Building 500. *Cf. O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

[12]Mr. Puckett participated in a meeting on August 1, 2012 with various representatives of the School of Medicine and the University Police Department. A memorandum describing that meeting prepared by Sergeant Mike Fischer indicates that while "[n]o specific threats have been made by Profita," "[f]aculty members felt that he was a little scary." *See* Exhibit 1 (doc. 107-1), attached to Plaintiff's Response to Defendant's Motion for Summary Judgment. On May 15, 2013, Lynn Whitten of the University Police Department advised one of her superiors that members of the School of Medicine faculty were requesting "extra patrols" as a result of

> a court ruling against Mr. Taylor Profita, a Med student who was expelled from
> the program some time ago. He has taken legal action and repeatedly lost his
> hearings/trials. He is being followed by the CARE team. Though there is no
> indication that he represents a threat, these folks are feeling somewhat frightened.
> . . . Appreciate anything your officers can do to make everyone feel safer.

*See* Exhibit 2 (Doc. #107-2), attached to Plaintiff's Response to Defendant's Motion for Summary Judgment.

[13]A transcript of Defendant Puckett's call to the University Police Department on June 12, 2013 includes the following comments by Mr. Puckett:

> CHRIS PUCKETT:    I think you need to actually – you may need to
> actually send somebody out to do something. I actually saw a student of ours

officers' contact with Mr. Profita later that same day.

> I observed Mr. Profita walking west on the sidewalk along the south side of 19th Avenue, adjacent to building 500. I contacted Mr. Profita as he walked west crossing the driveway to the RC1N loading dock. I first got his attention from behind when I said "sir" and he turned and looked at me. I asked if his name was Taylor and he said yes. I requested that he step back away from the sidewalk's path, south to the driveway (as to not impede pedestrian traffic so I could speak with him about his presence at the campus). He asked why he was stopped. I asked him his reason for being on campus. He stated he had a meeting. I told him I was told he was not be on campus unless for medical reason, and he replied that's not true, and that he was in a meeting with Dr. Lynn Fenton.[14] I contacted

---

> who has actually been asked not to be on campus, um who was actually entering into a building, Building 500. His name is Taylor Profita, P-r-o-f-i-t-a. That's why I was trying to get a hold of (inaudible) or Fischer or Schmidt down there, the situation with him. Um, he is allowed on campus for medical reasons only. The reason, I was calling is because he was – he's a bit unusual and he's wearing a long black jacket on a – or not a long jacket, but it's a long-sleeved jacket on a hot day like today. We have had concerns about him in the past. . . . . Well, I don't know where he was going in Building 500. He definitely went in the back door. . . . Um, and like I say, he may be appropriate – it may be appropriate for him to be here getting medical care. Um, it's just – it was just kind of unusual context to see him in. . . . And I know you got his – like I said, people have concerns about him, so – . . . And I don't know that you'll even be able to find him, frankly.

*See* Exhibit F (doc. # 93-6, at pp. 3-5), attached to Defendant's Motion for Summary Judgment. Mr. Profita contends that Mr. Puckett falsely told the University Police that he (Mr. Profita) was prohibited from being on campus, and disputes Mr. Puckett's "description of the environmental conditions [on June 12, 2013]," as well has his "report of any suspicious behaviors from my going into a very traditional doorway or entryway into" Building 500. *See* Exhibit I (doc. #112-9) (Deposition Transcript of Taylor Profita, at pp. 102:23-25, 103:1-25, and 10-4:1), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment. Mr. Profita has acknowledged, however, that he was wearing a "light black leather jacket" during his visit to the Anschutz Medical Campus on June 12, 2103. *Id..* at p. 103:11-15.

[14]The University of Colorado School of Medicine website identifies Dr. Fenton as an Assistant Professor and the Medical Director for the Student Mental Health Service at the Anschutz Medical Campus. Dr. Fenton apparently has served in the latter capacity since 2009. Mr. Profita testified that his last appointment with Dr. Fenton occurred on June 12, 2013. *See* Exhibit I (doc. #112-9) (Deposition Transcript of Taylor Profita, at p. 51:17-19), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment. However, there is nothing

Chief Abraham and he verified this.  Mr. Profita was asked in the future to have
Dr. Fenton contact the police to let us know when he would be coming to a
meeting and he also could do the same, and if someone called in reported seeing
him, we would not need to look for him to inquire why he was here.  Mr. Profita
asked who reported him and at that time I was not aware who called dispatch to
report him, but suggested he contact police records to obtain that information.[15]

*See* Exhibit 4 (doc. #95-4), attached to Plaintiff's Motion for Summary Judgment.  *See also*

Exhibit 12 (doc. #107-12), attached to Plaintiff's Response to Defendant's Motion for Summary

Judgment.  Mr. Profita apparently ended this contact with police by walking away.  There is no

indication that Plaintiff was arrested on June 12, 2013.

On June 12, 2013 at 3:33 p.m., Mr. Profita sent Mr. Puckett an email alluding to that

day's events.  Mr. Profita referred to "the false police report filed today concerning my rights of

access to the campus and the subsequent assault by the police officers that were involved when I

attempted to deny their unlawful search and detainment is a violation of my rights."  Mr. Profita

stated that he would be sending "out tomorrow" a "formal letter . . . of notification of intent to

_____

in the record to explain what prompted Mr. Profita to stop seeing Dr. Fenton after June 12, 2013.

[15]Mr. Profita, during his deposition, described his interaction with University police in
very different terms.  As Plaintiff recalled the event:

I was leaving the appointment from Building 500.  I was stopped by an officer in
a police car who called me by name.  I asked what it was concerning.  He exited
the car.  At that point, two other police officers or police cars arrived.  They asked
if I was aware that I was excluded from campus.  I expressed that I had no
information pertaining to that.  That had never been represented to me by anyone
of any authority, at which point they grabbed me, wrenched my arms, took me
against somewhat of a back wall, and proceeded to search me against my
objection. . . . One put me in a hold restraining my arms, and then the other
proceeded to search me.

*See* Exhibit I (doc. #112-9) (Deposition Transcript of Taylor Profita, at pp. 104:14-25 and 105:8-
13), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

sue" and would be seeking damages "on this issue." Mr. Profita further advised Mr. Puckett that

he "will not honor the schools (sic) request to remain away from campus." *See* Exhibit 15 (doc.

# 95-15), attached to Plaintiff's Motion for Summary Judgment. Plaintiff sent another email to

Mr. Puckett later that same day, reiterating his belief that neither Mr. Puckett "nor the university

have a right to arbitrarily exclude me from campus. The campus is open to the public and the

public has free access to it." *See* Exhibit 12 (doc. # 95-12), attached to Plaintiff's Motion for

Summary Judgment.

 Mr. Puckett responded by sending Mr. Profita an email on June 13, 2013 at 9:40 a.m.. As

Mr. Puckett recounted the circumstances of the day before:

> Yesterday I informed the police that I saw you entering Building 500 wearing a
> jacket in 90 degree weather. As you know, you are not to be on campus except
> for medical care, which apparently you were (see the attached e-mail). My
> understanding is that the police contacted you. If you have concerns about the
> police contact/conduct, you are welcome to file a complaint with them that will be
> investigated.

*Id.*

 It also appears that on June 13, 2013, Mr. Profita went to the University Police

Department where he submitted a Colorado Denver Police Department Complaint Form and

spoke with Sergeant Deana LoSasso. As summarized in a June 13, 2013 letter signed by Doug

Abraham, the University of Colorado Denver Chief of Police, Mr. Profita's "detailed account of

the occurrence . . . focuse[d] on several issues:"

- The individual that called the Police Department on June 13, 2013[16] made
  a false report;

---

[16]The court will presume that Chief Abraham's reference to June 13, 2013 is a
typographical error, since the parties agree that Mr. Profita's and Defendant Puckett's
interactions with University Police officers occurred on June 12, 2013.

- There are several false reports pertaining to your evaluations and conduct as a student and that this information was transmitted among other members of the University; [and]

- That these reports and comments constitute slander, libel and perjury.

*See* Exhibit H (doc. #93-8), attached to Defendant's Motion for Summary Judgment. As for Mr.

Profita's first concern, Chief Abraham advised that

> The individual that called the Police Department on June 13, 2013 was Chris Puckett who observed you enter a building on campus in 95 degree heat wearing a leather jacket. Mr. Puckett was aware that you had been notified that your presence in any University building was limited to medical treatment only. As such his call to the Police Department was with foundation and, in fact, firsthand information. There is no probable cause in support of violation of Colorado Revised Statute.

*Id.* In the same letter, Chief Abraham wrote:

> I want to reiterate what you have been informed via email and in person by Sergeant LoSasso.
>
>> You are no longer a student and are not be on the Anschutz Medical Campus except if/when you are receiving medical care and treatment. You are not to contact any of the faculty in person, mail or by email
>
> By your admission, you have acknowledged receipt of the email from Chris Puckett advising you of these conditions. You also acknowledged by your statement to Sergeant LoSasso that you were in the School of Medicine' Dean's Office. This is not complying with the direction provided by the University.
>
> Sergeant LoSasso has documented her verbal statement to you regarding these conditions. Your belief that you have a right to be on the campus is erroneous and any further violations may result in a formal exclusion from the campus, the issuance of a summons for trespass or your arrest.

*Id.*

Plaintiff sent a lengthy email to Mr. Puckett on June 14, 2013 at 1:14 p.m., addressing the

"interesting position" existing between Mr. Profita and the University of Colorado Denver.

The first will be my presence on the University campus. To date, aside from your request, I have received no official notification of a hearing and determination made as to limit my access to the campus. If there has been one, I would request to immediately appeal, as I do, as one who is in the process of studying medicine, have interest in the facilities and interest in contact with those with whom I have worked. I pose no threat to the campus and have done nothing but pursue litigation against the school, which does not pose a threat in any way. As such, I would ask 1) if a formal decision has been made concerning my restriction from the campus, when that restriction was made and the basis upon which it was predicated, and if so, how the University would like me to handle such an appeal of the decision.

Secondly, I am granted the right to reapply to the school of medicine, and as such do need to have contact with staff and faculty. . . . Further, for other endeavors, I would like to and believe I have the right to attain letters of recommendation and advice from the faculty with whom I have worked. As such, the blanket prohibition against my contacting the faculty and staff is in direct contrast with my stated rights as defined by the University. As such, I would ask how you would propose these be reconciled.

*See* Exhibit 23 (doc. #107-23), attached to Plaintiff's Response to Defendant's Motion for

Summary Judgment, and Exhibit 18 (doc. #95-18), attached to Plaintiff's Motion for Summary

Judgment.

Further communication between Mr. Profita and Mr. Puckett followed. In a letter dated

June 19, 2013, Mr. Puckett wrote to Mr. Profita regarding the "Exclusion Order." As Mr.

Puckett set forth his view of the salient circumstances:

On May 16, 2013, you were instructed not to be on campus except for the purpose of medical care and treatment. You violated this restriction on June 12, 2013, by visiting the School of Medicine Dean's Office. As a member of the public, you have no "right" to be on campus. Although the University of Colorado is a public institution of higher education, the University may still restrict who has access to its buildings and properties.

Given your disregard for the guidelines set in place on May 16, 2013, the Chief of

Police will be issuing you a formal Level I exclusion order[17] in accordance with University policy. See Attached Policy. As a condition of your Level I exclusion you will be required to notify the [Anschutz Medical Campus] Police Department any time you plan to come to campus for medical treatment. Again, the only reason you should be on campus is for medical treatment and you are restricted from requesting meeting with any campus official, unrelated to your medical care.

If you do not abide by these requirements, the Police Department may issue a Level II or III exclusion and/or pursue criminal trespass charges.

In response to your request to meet with Dean Krugman or Associate Dean Garrity, your request is denied. As you know, you may reapply to medical schools through EMCEES. Please continue to direct your communications to me or David Temple if you desire to contact anyone within the University.

*See* Exhibit 17 (doc. #107-17), attached to Plaintiff's Response to Defendant's Motion for Summary Judgment, and Exhibit 13 (doc. #95-13), attached to Plaintiff's Motion for Summary Judgment.

On June 24, 2013, Mr. Profita was personally served with a Level I Warning/Exclusion[18] by the University of Colorado Denver Police Department. That document advised Mr. Profita that his

_____

[17]For the sake of consistency, this Recommendation will use the phrase "Level I Warning/Exclusion," which appears at the top of the document served on Mr. Profita on June 24, 2013.

[18]Standard Operating Procedure Number 408 for the University of Colorado Denver states that the Chief of Police and University of Colorado Denver police officers are empowered by the Chancellor to (1) issue warnings to persons who are in violation of University or Regent rules and regulations; and (2) exclude a person whose behavior is "deemed to be detrimental to the well-being of the University or incompatible with the function of the University as an educational institution" or "those who interfere with the staff, students, or faculty of the University of Colorado Denver in the performance of their job duties, or educational pursuits." This Standard Operating Procedure further states that "[i]t is the policy of the University of Colorado Denver Police Department to enforce this delegation of authority through a system of warnings and exclusions." *See* Exhibit 8 (doc. #95-8), attached to Plaintiff's Motion for Summary Judgment.

> presence on campus presents a concern to the campus community and is
> disruptive. To wit: you have been previously advised that you are not to be on the
> Anschutz Medical Campus except if/when you are receiving medical care and
> treatment. You have violated that condition by visiting the Dean's office. As a
> requirement of this Level I exclusion, you will be obligated to notify the
> [Anschutz Medical Campus] Police Department . . . any time you plan to come to
> campus for medical treatment. You will traverse directly to and from your
> provider. You are also advised that you are not to contact any of the faculty in
> person, by phone, by mail, or by e-mail.

The Level I Warning/Exclusion also informed Mr. Profita that "further violations by you, may

result in your exclusion from campus as directed by the Chancellor of the University of Colorado

Denver or his or her designees." *See* Exhibit K (doc. # 93-11), attached to Defendant's Motion

for Summary Judgment; Exhibit 22 (doc. #107-22), attached to Plaintiff's Response to

Defendant's Motion for Summary Judgment; and Exhibit 10 (doc. # 95-10), attached to

Plaintiff's Motion for Summary Judgment. *See also* Exhibit 2 (doc. #95-2), attached to

Plaintiff's Motion for Summary Judgment.

On July 8, 2013, Chief Abraham rescinded the Level I Warning/Exclusion issued to Mr.

Profita on June 24, 2013. However, Chief Abraham directed Plaintiff to communicate with Mr.

Puckett should Mr. Profita wish to contact University employees "regarding your application" to

the Medical School.[19] *See* Exhibit M (doc. # 93-13), attached to Defendant's Motion for

Summary Judgment, and Exhibit 16 (doc. #95-16), attached to Plaintiff's Motion for Summary

Judgment.

─────────────────────

[19]On July 18, 2013, Mr. Puckett responded to Mr. Profita's request to meet with
University of Colorado Denver Chancellor Elliman. Defendant Puckett indicated that "[t]he
Chancellor has considered your request and declines to meet with you." Mr. Puckett reiterated
once again that "your communication with the University needs to come through either David
Temple or myself. We will then be in contact with our client representatives as necessary in
order to respond to any request/inquiry that you may have." *See* Exhibit M (doc. #112-13),
attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

B.     The Defense of Qualified Immunity

Mr. Profita has invoked the court's subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, asserting that his claims arise "under the Constitution, laws, or treaties of the United States." Section 1983 creates a cause of action where a "person . . . under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." Section 1983 does not create any substantive rights; rather, it creates a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-618 (1979). *See also S. Disposal, Inc. v. Texas Waste Mgmt.*, 161 F.3d 1259, 1265 (10th Cir. 1998) ("In order to successfully state a cause of action under section 1983, [plaintiff] must allege . . . the deprivation of a federal right[.]"). In short, to establish a claim under § 1983, Mr. Profita must plausibly demonstrate that he was deprived of a right secured by the Constitution or laws of the United States.

In this case, Mr. Puckett has invoked the doctrine of qualified immunity, which "is an affirmative defense to a section 1983 action." *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 685 F.3d 903, 909 (10th Cir. 2012) (internal quotation marks and citations omitted). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

18

"When the defense of qualified immunity is raised in a summary judgment motion, we apply special rules to determine whether the motion was properly granted or denied." *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004) (internal quotation marks and citation omitted). *See also Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (the court's review of summary judgment "in the qualified immunity context differs from that applicable to review of other summary judgment decisions."). "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff," who must meet a two-part test before the defendant will bear the traditional burden of a movant for summary judgment under Rule 56(c). *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotation marks and citation omitted).

> Specifically, [t]he plaintiff initially bears a heavy two-part burden [and] must show (1) that the defendant's actions violated a constitutional . . . right, and (2) that the right allegedly violated [was] clearly established at the time of the conduct at issue. Unless the plaintiff carries [his] twofold burden, the defendant prevails.

*Reynolds*, 370 F.3d at 1030 (internal quotation marks and citations omitted). *See also Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) ("If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment – showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.") (internal quotation marks omitted). "A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Herrera v. City of Albuquerque,* 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks omitted).

For purposes of the qualified immunity doctrine, "[t]he 'clearly established' inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that 'every reasonable [state] official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093 (2012). Stated differently, "the salient question . . . is whether the state of the law at the time of [the] incident provided 'fair warning'" to defendants that their alleged conduct was unconstitutional. *Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

> For the law to be "clearly established," there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent."

*Pompeo v. Bd. of Regents of the Univ. of New Mexico*, 852 F.3d 973, No. 15-2179, 2017 WL 1149501, at *5 (10th Cir. Mar. 28, 2017) (internal citations omitted). "Although plaintiff can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question 'beyond debate." *Garcia v. Escalante*, __ F. App'x __, No. 15-2058, 2017 WL 443610, at *4 (10th Cir. Feb. 2, 2017)("The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established."") (internal quotation marks omitted). There must be "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (internal

quotation marks and citations omitted).[20]

C.    Plaintiff's First Claim for Relief

Mr. Profita's first claim is predicated on the events of June 12, 2013 and "The False Police Report and False Report of a Lawful Exclusion of Profita from the Anschutz Medical Campus."  In support of this claim, Plaintiff alleges that at all relevant times, he had a constitutionally protected liberty and property interest and right "in receiving medical care at the Anschutz Medical Campus," "having access to the public and medical facilities provided, housed and hosted" there, as well as "having access to the public and open grounds open to and readily available to the general public."  *See* Complaint, at ¶¶ 55-58.  The first claim asserts that Mr. Puckett's "false report to the University Police" deprived Mr. Profita of these property and liberty interests without due process in violation of the Fourteenth Amendment and his "Fourth Amendment protections against unlawful searches and seizures."  *See* Complaint, at ¶¶ 64-66. Defendant Puckett argues, in his motion for summary judgment, that Plaintiff's first claim fails as a matter of law because he did not submit a false report on June 12, 2013 and because Mr. Profita has not sustained his "heavy burden" under the doctrine of qualified immunity.

There is no evidence in the record to suggest that Mr. Profita was formally arrested on June 12, 2013.  That conclusion, however, does not end the court's Fourth Amendment analysis.

An investigative detention occurs when an officer stops and briefly detains a

_____

[20]The Supreme Court recently cautioned that "'clearly established law' should not be defined 'at a high level of generality;'" rather "the clearly established law must be 'particularized to the facts of the case.'"  *White v. Pauly*, __ U.S. __, 137 S.Ct. 548, 552 (2017) (per curiam).  "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  *Id.*

person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out." * * * "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. . . . An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*J.H. ex rel. J.P. v. Bernalillo Cty.*, 61 F. Supp. 3d 1085, 1143-44  (D.N.M. 2014) (internal

citations omitted).  Mr. Profita contends that after being approached by University police officers

on June 12, 2013, he was grabbed, his arms were "wrenched," he was placed against a wall and

searched by one officer as another officer restrained his arms.  *See* Exhibit I (Deposition

Transcript of Taylor Profita, at pp. 104:14-25 and 105:1-25), attached to Defendant's Response

to Plaintiff's Motion for Summary Judgment.

     None of the foregoing facts are reflected in the corresponding police report.  *See* Exhibit

4 (doc. #95-4), attached to Plaintiff's Motion for Summary Judgment.  But for purposes of

Defendant's motion, I must construe the facts in a light most favorable to Mr. Profita, the non-

moving party.  Nevertheless, Plaintiff cannot prevail on his Fourth Amendment claim if

Defendant Puckett did not personally participate in that alleged constitutional violation.

     As the Tenth Circuit acknowledged in *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.

1997), "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged

constitutional violation;" state officials are only liable for their own misconduct. "To establish personal liability, a plaintiff must show that the [named defendant] caused the deprivation of a federal right." *Nasious v. Colorado*, No. 09-cv-01051-ZLW-KMT, 2011 WL 721255, at *4 (D. Colo. Jan. 10, 2011) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)), *rec. and report adopted*, 2011 WL 798857 (D. Colo. Feb. 22, 2011). Alternatively, a plaintiff can establish the required causal connection by showing that the defendant "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Poolaw v. Marcantel*, 565 F.3d 721, 732-33 (10th Cir. 2009). "[A] defendant may be liable if a plaintiff can show that an 'affirmative link exists between the [constitutional] deprivation and either the [officer's] personal participation, his exercise of control or direction, or his failure to supervise." *Id.* at 733.

To the extent that Mr. Profita is alleging that Defendant Puckett violated his Fourth Amendment rights on June 12, 2013, I conclude that portion of the first claim for relief must fail. Mr. Profita has not come forward with any evidence to show that Mr. Puckett was physically present during the interaction between Plaintiff and law enforcement officers. There is absolutely no evidence in the record to suggest that Mr. Puckett was the officers' supervisor or within their chain of command. More importantly, Mr. Puckett did not direct University officers to seize or briefly detain Mr. Profita. *Cf. J.H. ex rel. J.P.*, 61 F. Supp. 3d. at 1143 (recognizing that a consensual encounter does not constitute a seizure within the meaning of the Fourth Amendment and "occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter" or when a police officer interviews someone "for the purpose of investigating a

complaint or conducting other official business"). Nothing in the record would permit a reasonable trier of fact to find that Defendant Puckett knew or reasonably should have known that his brief telephone call on June 12, 2013 would culminate in a possible deprivation of Plaintiff's Fourth Amendment rights. To the contrary, Mr. Puckett acknowledged that Mr. Profita might properly be on campus for medical treatment or might not even be located by officers.

The facts in this case are remarkably similar to those in *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010). In that case, the plaintiff alleged that the defendant's decision to alert authorities to a possible case of unauthorized practice of medicine made that same defendant liable for unlawful activities subsequently taken by other state officers. In rejecting that argument, the Tenth Circuit observed that the plaintiff was relying on "the speculative assumption that one state officer seeking to report a violation of law to other state officers 'just should've known' that those other officers would respond to the report by themselves violating the law." *Id.* Writing for the majority of the three-judge panel, then-Circuit Judge Gorsuch noted that "we have, however, previously and consistently rejected exactly this assumption, emphasizing that 'more than pure speculation' is required 'to defeat a motion for summary judgment." *Id.* (quoting *Setliff v. Mem'l Hosp. of Sheridan Cty.*, 850 F.2d 1384, 1394 (10th Cir. 1988)).

> There is no question that Dr. Tripp was legally authorized to report the unlicensed practice of medicine and to solicit help from other state authorities to ensure its investigation and cessation. To survive summary judgment under *Poolaw*, Dr. Lewis had to come forward with some evidence that Dr. Tripp somehow knew or should've known that an *unlawful* investigation would follow from his decision to report Dr. Lewis' unauthorized practice of medicine. In the record before us, there is no evidence of this. Accordingly, Dr. Lewis hasn't demonstrated a constitutional violation, let alone a clearly established one. If qualified immunity

is to mean anything, it must mean that public employees who are just doing their
job are generally immune from suit.

*Id.* (emphasis in original).  To the extent Plaintiff's first claim alleges a Fourth Amendment

violation by Defendant Puckett on June 12, 2013, I conclude that Mr. Profita has failed to come

forward with evidence that would demonstrate Mr. Puckett's personal participation in that

constitutional violation.

The first claim for relief seemingly argues, in the alternative, that Defendant Puckett's June

12, 2013 telephone call constituted a false police report that, alone or in combination with the

restrictions set forth in his May 16, 2013 email, caused a violation of Mr. Profita's Fourteenth

Amendment rights.  An individual has "no constitutional right to an accurate police report."

*Brandt v. City of LaGrange*, No. 2:15CV7 ERW/HEA, 2015 WL 1542086, at *5 (E.D. Mo. Apr.

7, 2015).  The filing of a false police report alone does not deprive a person of a constitutional

right under the Fourteenth Amendment.  *White v. Tamlyn*, 961 F. Supp. 1047, 1056 (E.D. Mich.

1997).  "A falsified police report constitutes a due process violation only when it leads to an

unconstitutional deprivation of life, liberty, or property."  *Brandt*, 2015 WL 1542086, at *5

(citing *Shock v. Tester*, 405 F.2d 852, 855 (8th Cir. 1969)).  *Cf. Graham v. City of Albany*, No.

1:08-CV-892 (RFT), 2009 WL 4263510, at *9 (N.D.N.Y. Nov. 23, 2009) ("[T]he mere filing of

false police reports, by themselves and without more, does not create a right of action in

damages under 42 U.S.C. § 1983."); *O'Con v. Katavich*, No. 1:13-cv-1321-AWI-SKO, 2013 WL

6185212, at *9 (E.D. Cal. Nov. 26, 2013) (noting "[t]here is no constitutional right to a correct

police report" and an "officer's falsification of a report only constitutes a due process violation

when the alleged falsified report leads to an unconstitutional deprivation of life, liberty or

property").  *See also Jarrett v. Township of Bensalem*, 312 F. App'x 505, 507 (3rd Cir. 2009)

(surveying cases that have held that the filing of a false police report is not itself a constitutional violation).

When asked during his deposition to identify what was false about Mr. Puckett's June 12, 2016 report to the University Police Department, Mr. Profita said: "[t]he allegation that I was prohibited from being on campus." Mr. Profita also disputed Mr. Puckett's "description of the environmental conditions.[21] His report of any suspicious behaviors from my going into a very traditional doorway or entry way into [Building 500]." *See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita, at pp. 102:23-25 and 103:1-10), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment. In point of fact, Mr. Profita has not come forward with any evidence that would prove, or even suggest, that Mr. Puckett made a "false police report" during his June 12, 2013 telephone conversation with the University Police Department.

Under Colorado law, the crime of "false reporting to authorities" requires proof that the defendant "ma[de] a report or knowingly cause[d] the transmission of a report to law enforcement authorities of a crime or other incident within their official concern when he [knew] that it did not occur." *See* Colo. Rev. Stat. § 18-8-111(1)(b). In contacting the police on June 12, 2013, Mr. Puckett simply indicated that he had seen Mr. Profita enter Building 500 and that

---

[21]Mr. Profita takes exception to Mr. Puckett's assertion that Plaintiff's clothing on June 12, 2013 was inappropriate given the outside temperature on June 12, 2013, which Plaintiff maintains was approximately 80 degrees Fahrenheit. *See* Plaintiff's Motion for Summary Judgment, at 3. Although Mr. Puckett did refer to Mr. Profita's apparel and the outside temperature during his call to the University Police Department, a disagreement about ambient temperature and appropriate apparel is not material to the issues raised in Defendant's Motion for Summary Judgment. *See Fischer v. Kleschewski*, No. 15-cv-1995-WJM-STV, 2017 WL 1077644, at *1 (D. Colo. Mar. 22, 2017) ("A fact is 'material' if, under the relevant substantive law, it is essential to proper disposition of the claim. An issue is 'genuine' if the evidence is such that it might lead a reasonable trier of fact to return a verdict for nonmoving party.") (internal citations omitted).

University officials "have had concerns about him in the past." Mr. Puckett also told the University Police Department that Mr. Profita was allowed on campus for medical reasons, that he (Mr. Puckett) did not know Mr. Profita's precise purpose for entering Building 500, and that "it may be appropriate for [Plaintiff] to be getting medical care." None of that information was knowingly false. Mr. Puckett knew that on May 16, 2013, he had sent an email advising Mr. Profita that he could not be on campus "except if/when you are receiving medical care and treatment" and that he should contact Mr. Puckett or David Temple if he "need[ed] to contact anyone with a question or issue with the University, other than for medical care/treatment."

When asked during his deposition about the May 16, 2013 email from Mr. Puckett, Mr. Profita admitted that he received that email, "but didn't put much stock in it" at the time. He also explained that he "honor[ed] the request" because "the only time I was going down to campus was for medical reasons." Mr. Profita further testified that he did not "push the issue as to the other aspects of" the email until the events of June 12, 2013. *See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita, at pp. 133:14-18 and 134:16-25), attached to Defendant's Response to Plaintiff's Motion for Summary. Mr. Profita has not come forward with any evidence that would demonstrate Mr. Puckett had any reason to know that Mr. Profita challenged the restrictions set forth in the May 16, 2013 email at the time Defendant called the University Police Department on June 12, 2013. In short, Mr. Profita has not presented any evidence from which a reasonable trier of fact could find that Defendant Puckett made a false police report on June 12, 2013.

Even if the court were inclined to find that Mr. Puckett submitted a false police report in the June 12, 2013 phone call, Mr. Profita cannot prevail on his claim for relief unless that phone

call either alone or in conjunction with the May 16, 2013 email resulted in a violation of Mr. Profita's Fourteenth Amendment rights.

The Due Process Clause of the "Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Estate of DiMarco v. Wyo. Dept. of Corrections*, 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting the Due Process Clause of the U.S. Const. amend. XIV, sec. 1). "The Supreme Court's interpretation of this clause explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994). However, to prevail under either theory, "a plaintiff must first establish that a defendant's action deprived plaintiff of a protectible property interest." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). *See also Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) ("[a] due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered"). "To demonstrate a property interest, 'a person clearly must have more than an abstract need or desire for [a certain benefit] . . . [h]e must have more than a unilateral expectation of it;' rather a person must have a 'legitimate claim of entitlement.'" *Reid v. Stanley*, No. 1:11-CV-2043, 2011 WL 6371793, at *4 (N.D. Ohio Dec. 20, 2011) (in dismissing plaintiff's Fourteenth Amendment claim, the court held that this post-doctorate researcher had not demonstrated that he had a constitutionally protected property interest in the use of a computer station).

Mr. Profita's Fourteenth Amendment claims running throughout the Complaint rely primarily on the Colorado Supreme Court's decision in *Watson v. Board of Regents of the*

*University of Colorado*, 512 P.2d 1162 (Colo. 1973).[22]  *See* Plaintiff's Response to Defendant's

Motion for Summary Judgment, at 4-6, and Plaintiff's Motion for Summary Judgment, at 5-17.

In that case, the Colorado Supreme Court held that "[w]here students have been subjected to

disciplinary action by University officials, courts have recognized that procedural due process

requires – prior to imposition of the disciplinary action – adequate notice of the charges,

reasonable opportunity to prepare to meet the charges, an orderly administrative hearing adapted

to the nature of the case, and a fair and impartial decision."[23]  The Colorado Supreme Court

further held that these same due process protections "must be afforded non-students who may be

permanently denied access to University functions and facilities."  *Id.*

A plain reading of *Watson* makes clear that the circumstances of Mr. Profita's case are

factually distinguishable.  The Colorado Supreme Court specifically noted that after his

application for admission to the University of Colorado was denied, Mr. Watson was charged

with criminal assault based on intimidating conduct that he directed toward a member of the

University's Special Admissions Committee.  As a result of that criminal charge, Mr. Watson

---

[22] Again, to overcome Defendant's assertion of qualified immunity, Mr. Profita must point to United States Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented in his case.  A single decision by the Colorado Supreme Court does not suffice to meet that requirement.

[23] A very different due process standard applies where a student is terminated for academic reasons.  "[T]he due process clause does not require that a student dismissed from a state medical school for academic reasons be given a hearing.  Rather, . . . the due process clause requires no more than that the student [have prior] notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and [that] the decision to dismiss the student [be] careful and deliberate."  *Trotter v. Regents of the Univ. of N.M.*, 219 F.3d 1179, 1185 (10th Cir. 2000) (citing *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) and *Schuler v. Univ. of Minn.*, 788 F.2d 510 (8th Cir. 1986)).

was completely banned from entering the University of Colorado campus, as well as "all buildings located thereon, and any other property owned or possessed by the University." At the time the ban was imposed, Mr. Watson

> had a substantial, albeit unofficial connection with the University. He was a consultant to the Black Student's Alliance, a co-instructor in a course offered by the University, and the Vice-President and General Manager of the Colorado Cooperative Council (an organization which provided low-cost housing for students off-campus). Additionally, the plaintiff had arranged to do consultant work with the University's College of Environmental Design. Finally, there was uncontradicted evidence at trial that the plaintiff's ability to carry on these various activities would be seriously jeopardized if he was denied access to the University campus.

*Id.* at 1164.

In contrast, Mr. Profita was terminated from the School of Medicine for academic deficiencies, not disciplinary violations. After January 3, 2013, Mr. Profita no longer had any status or rights as a University of Colorado medical student. Therefore, when Mr. Puckett sent his May 16, 2013 email, Plaintiff's rights vis-a-vis the School of Medicine and the Anschutz Medical Campus were no greater than any other member of the general public. Also, unlike the plaintiff in *Watson*, Mr. Profita was not absolutely denied access to all University functions and facilities. Mr. Puckett's May 16, 2013 email made clear that Plaintiff was permitted, without prior notice, to be on the Anschutz Medical Campus for purposes of receiving medical treatment.

Although Mr. Profita has not cited any Supreme Court or Tenth Circuit decisions that have adopted the Colorado Supreme Court's analysis in *Watson*, several federal courts have held that a public university is not required to allow the public unfettered access to its premises, regardless of their conduct. *See, e.g., Souders v. Lucero*, 196 F.3d 1040, 1044 (9th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000). In *Uzoukwu v. Prince George's Community College Board*

*of Trustees*, No. DKC 12-3228, 2013 WL 4442289, at *7-8 (D. Md. Aug. 15, 2013), the court

held that the plaintiff, either as an alumni of the defendant institution or as a prospective student

thinking about enrolling in a new program, did not have a constitutionally protected interest in

accessing campus facilities, and thus "there was no need to address" her due process claim.  *Cf.*

*Holbach v. Jenkins*, No. 4:09-CV-026, 2009 WL 2382756, at *6 (D. N.D. Jul. 30, 2009) (the *pro*

*se* plaintiff challenged a no-trespass order issued by the Director of Student Affairs for Minot

State University; in dismissing the plaintiff's constitutional claims, the court noted that

"members of the general public have neither a liberty nor property interest in being present on a

university campus, and, absent any such interest, are not entitled to the procedural due process

protections of the Fourteenth Amendment"), *aff'd,* 366 F. App'x 703 (8th Cir. 2010).  *See also*

*O'Connor v. Bassoff*, No. 15-cv-02121-GPG, 2015 WL 7774287, at *4 (D. Colo. Dec. 3, 2015)

("the law is well established that parents have no constitutional right to physically access school

grounds" and school officials are "well within constitutional bounds in limiting access to school

property where it is necessary to maintain tranquility"), *appeal dismissed*, No. 15-1493 (10th

Cir. Jan. 22, 2016); *Abegg v. Adams/Arapahoe Sch. Dist. J8/Aurora Pub. Sch.*, No. 12-cv-01084-

REB-MJW, 2012 WL 7783087, at *5 (D. Colo. Oct. 9, 2012) ("members of the general public

have neither a liberty nor property interest in being present on a school campus, and absent such

an interest, they are not entitled to the procedural due process protections of the Fourteenth

Amendment"), *report and rec. adopted,* 2013 WL 1164473 (D. Colo. Mar. 21, 2013).

I find, under the present factual record, that Mr. Profita did not have a constitutionally

protected liberty or property interest[24] that was violated either by the restrictions set forth in Mr. Puckett's May 16, 2013 email or Mr. Puckett's telephone contact with the University Police Department on June 12, 2013.  As the court noted in *Player v. University of Idaho-Moscow,* No. 3:14-CV-00238-EJL-REB, 2015 WL 9898131, at *3 (D. Idaho Aug. 3, 2015), *subsequently aff'd without reaching issue sub nom. Player v. Univ. of Idaho,* No. 15-35933, 2017 WL 1046187 (9th Cir. Mar. 20, 2017), "there is no constitutionally-protected interest in being present on campus" and "non-students, including alumni, do not have the same rights to travel around campus and access to its buildings as do the students and employees."  The court in *Player* held that "a decision by the University to exclude a particular non-student from the campus after he has continued to contact various University employees against the University's restriction does not violate that person's constitutional rights."  *Id.*

Moreover, I find that Defendant Puckett's actions did not seriously impinge on whatever incidental rights Mr. Profita might have had as a member of the general public and, therefore, did not rise to the level of a deprivation of a liberty interest.  *Cf. Price v. Mount Waschusett Cmty. Coll.*, No. 11-10922-FDS, 2012 WL 3596859, at *6-7 (D. Mass. Feb. 17, 2012) (holding that a no-trespass notice that barred a community college student from entering onto any premises of the college except to attend classes did not deprive that plaintiff of a liberty or property interest;

_____

[24]In his Motion for Summary Judgment, Mr. Profita also cites *Prouty v. Heron*, 255 P.2d 755 (Colo. 1953) for the proposition that "one who is qualified for admittance and license to practice [a particular profession] without restriction, under the standards applicable at the time of admission, thereby acquires a valuable right fully protected and covered by the due process clause of the Federal and State Constitutions."  This decision by the Colorado Supreme Court will not suffice to satisfy the "clearly established" prong of the qualified immunity doctrine.  More importantly, Mr. Profita cannot claim to have a property interest in the right to practice medicine, as he is neither a medical school graduate nor the holder of a valid license to practice medicine.

the court noted that the plaintiff, in accessing non-academic facilities or activities that were unrelated to her association with the campus as a student, was "essentially a member of the general public" and had no "constitutionally protected interest"); *Collins v. Univ. of N.H.*, 746 F. Supp. 2d 358, 369-371 (D.N.H. 2010) (in holding that a tenured professor's banishment from campus did not deprive him of a liberty or property interest, the court noted that the ban in question was subject to exceptions "for plaintiff's legitimate needs;" the court also acknowledged that members of the general public have no liberty interest in being present on a university campus), *aff'd,* 664 F.3d 8 (1st Cir. 2011). Because Defendant Puckett's email and telephone contact did not deprive Plaintiff of a constitutionally protected liberty or property interest, the court is not required to address the adequacy of the processes attendant upon those actions. Judgment on the first claim for relief should enter in favor of Mr. Puckett.

D.     <u>Plaintiff's Second Claim for Relief</u>

Mr. Profita's second claim focuses on the events on and after June 24, 2013 in connection with "The Unlawful Issuance of an Allegedly Exclusionary Order Issued in Violation of Profita's Due Process Rights." This claim alleges that Defendant Puckett issued an unauthorized and arbitrary exclusion order on June 24, 2013 that violated Plaintiff's rights under the Fourteenth Amendment. More specifically, Mr. Profita contends that the exclusion order deprived him of "a constitutionally protected liberty and property interest and right in receiving medical care at the Anschutz Medical Campus," "a constitutionally protected liberty and property interest and right in having access to the public and medical facilities provided, housed and hosted at the Anschutz Medical Campus," "a constitutionally protected liberty and property interest and right in having access to the public and open grounds open to and readily available

to the general public," and "a constitutionally protected right to due process pertaining to the deprivation of his property and liberty interests." *See* Complaint, at ¶¶ 80-83. Plaintiff further asserts that the "exclusionary order" was "issued without hearing, notification of hearing, the opportunity to defend such action, or the existence of circumstances or evidence provided to support a basis for its issuance, as required by law." *Id.* at ¶ 84.

In moving for summary judgment as to Plaintiff's second and third claims for relief, Mr. Puckett again asserts the defense of qualified immunity. Moreover, Defendant contends that he did not "issue" or personally participate in the "promulgation" of the Level I Warning/Exclusion that forms the underpinning of these two claims. It is fair to say that the latter point is hotly contested by the parties.

Defendant insists that he did not issue the Level I Warning/Exclusion that Mr. Profita received on June 24, 2013. *See* Exhibit B (Affidavit of Chris Puckett) (doc. #93-2), attached to Defendant's Motion for Summary Judgment. Mr. Puckett claims that he "did not direct anyone at the . . . Police Department to issue the Level I Warning to Plaintiff," that he does "not have the authority to issue exclusions on behalf of the University of Colorado,[25] and . . . did not issue any exclusion to Plaintiff." Mr. Puckett contends that he simply was asked to notify Mr. Profita by letter that the University Police Department "intended to issue a Level I Warning to Plaintiff" and that he sent that letter on June 19, 2013.

_____

[25]The University of Colorado Denver Chancellor has empowered the Chief of Police and University of Colorado Denver Police Officers to "issue warnings" and "exclud[e] any person who's behavior is deemed detrimental to the well-being of the University or incompatible with the function of the University as an educational institution." *See* Exhibit 8 (doc. #95-8), attached to Plaintiff's Motion for Summary Judgment. Standard Operating Procedure Number 408 does not purport to delegate comparable authority to Assistant and Associate General Counsel for the University of Colorado Denver.

Chief Abraham acknowledges that "[on or about June 20, 2013, [he] reviewed and approved an exclusion, specifically a Level I Warning, related to Taylor Profita," but denies that he acted at the direction of Defendant Puckett or that Mr. Puckett "issued any exclusion to Mr. Profita." *See* Exhibit J (Affidavit of Doug Abraham) (doc. #93-10), attached to Defendant's Motion for Summary Judgment. Mr. Puckett also has proffered an affidavit from Lynn Whitten, who in 2013 was serving as a community resource officer with the University of Colorado Denver Police Department. Ms. Whitten acknowledged that "[f]rom time to time, the University of Colorado-Denver Police Department would request legal advice of University counsel, including Mr. Chris Puckett, regarding exclusions or other matters." *See* Exhibit L (Affidavit of Lynn Whitten) (doc. #93-12), attached to Defendant's Motion for Summary Judgment. In her affidavit, Ms. Whitten states

> 8. On or about June 20, 2013, I wrote a Significant Incident Report concerning the issuance of a Level I Warning or exclusion to Mr. Profita. In the narrative portion of the report, I noted that I had received "direction" from Mr. Chris Puckett to issue the Level I Warning. I may have received legal advice from Mr. Puckett regarding Mr. Profita's exclusion. However, Mr. Puckett did not instruct, order, or direct me to issue the exclusion.
>
> 9. Mr. Puckett did not issue any exclusion to Mr. Profita.

*Id.*[26]

Mr. Profita maintains that Defendant Puckett did participate in the issuance of the Level I Warning/Exclusion and challenges the assertions in the aforementioned affidavits as contrary to official records produced by Defendant in discovery. The Significant Incident Report signed by

---

[26]Mr. Profita apparently elected not to depose Ms. Whitten or any other individuals, so the only explanation that we have for Ms. Whitten's choice of language in the Significant Incident Report comes from her own Affidavit.

Ms. Whitten and referenced in her Affidavit states, in pertinent part, that "[o]n 06-18-13, I . . . received direction from Mr. Chris Puckett (University Legal Counsel) to issue Mr. Taylor Profita a Level 1 Warning." *See* Exhibit 7 (doc. #95-7), attached to Plaintiff's Motion for Summary Judgment.[27]  Plaintiff also points to Mr. Puckett's letter of June 19, 2013, wherein Defendant states that "[g]iven [Plaintiff's] disregard for the guidelines set in place on May 16, 2013, the Chief of Police will be issuing you a formal Level I exclusion order in accordance with University policy." *See* Exhibit 13 (doc. #95-13), attached to Plaintiff's Motion for Summary Judgment.  Mr. Profita suggests that Mr. Puckett's direct involvement in the issuance of the Level I Warning/Exclusion is manifest in Chief's Abraham's letter of June 13, 2013, which quotes verbatim from Mr. Puckett's email of May 16, 2013.  *See* Exhibit 2 (doc. #133-2), attached to Plaintiff's Reply to Defendant's Response, and Exhibit 6 (doc. #95-6), attached to Plaintiff's Motion for Summary Judgment.  Finally, I note that the Level I Warning/Exclusion served on Mr. Profita does not identify the "Issuing Officer" at the top of that form, while the space labeled "Signature of Issuing Officer" at the bottom of the form bears an illegible signature.[28]  *See* Exhibit 10 (doc. #95-10), attached to Plaintiff's Motion for Summary Judgment.

Seizing on the language in paragraph 8 of Ms. Whitten's Affidavit, which states that "Mr. Puckett did not instruct, order, or direct me to issue the exclusion," Mr. Profita notes that the Merriam-Webster dictionary defines "direct" to mean, *inter alia*, "to impart orally," to

---

[27]In the same Report, Officer Whitten noted that "Chief Doug Abraham has reviewed the Level 1 Warning and concurs with its issuance."

[28]Although the scrawled signature at the bottom of the Level I Warning/Exclusion appears to be a closer match for "L. Whitten" than "C. Puckett," the court declines to reach any conclusion on that point.

"dominate and determine the course of," "request or enjoin with authority," or "to show or point out the way."  *See* Plaintiff's Motion to Vacate Defendant's Motion for Summary Judgment (doc. #122), at 3.  In light of that definition, Plaintiff contends that Ms. Whitten's Affidavit directly contradicts her Significant Incident Report in which states that she received "direction" from Mr. Puckett to issue the Level I Warning/Exclusion.

In point of fact, Ms. Whitten's Significant Incident Report and her specific reference to Mr. Puckett is susceptible to more than one interpretation.  *But see Matsushita Elec. Industrial Co.*, 475 U.S. at 586-87 ("[w]hen the moving party has carried its burden under Rule 56(a), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'").  *Cf. Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party.").  Here, "the record as a whole" consists of the affidavits of Mr. Puckett, Ms. Whitten, and Chief Abraham, together with the reports and other official documents they authored, weighed against Mr. Profita's own doubts as to the veracity of those affidavits.  *See J.H. ex rel. J.P.*, 61 F. Supp. 3d at 1135 ("A mere 'scintilla' of evidence will not avoid summary judgment.  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. . . . If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may

be granted.").[29]  Mr. Profita's interpretation of official records may not rise much beyond a "scintilla" of evidence, but I will construe the record in a light most favorable to Plaintiff and not opine on the credibility of any witness.

Although § 1983 liability requires that the defendant personally participate in the alleged constitutional violation, there is some evidence in the record that *could* be interpreted as suggesting that Defendant Puckett "set in motion a series of events" that culminated in the issuance of the Level I Warning/Exclusion.  *Cf. Poolaw*, 565 F.3d at 732-33.  Accordingly, I am not persuaded by Defendant's "lack of personal participation" defense.  Therefore, the court will proceed to address the substance of the second and third claims, and Mr. Puckett's claims of qualified immunity.

To place the second claim for relief in context, it is useful to reiterate the limitations set forth in Mr. Puckett's May 16, 2013 email and the language contained in the Level I Warning/Exclusion served on June 24, 2013.  Mr. Puckett's email stated that Mr. Puckett should:

> not to be on campus except if/when you are receiving medical care and treatment. You are not to contact any of the faculty involved in person, mail, or by e-mail.  If you need to contact anyone with a question or issue with the University, other than for medical care/treatment, please work through me or David Temple.

*See* Exhibit E (doc. #93-5), attached to Defendant's Motion for Summary Judgment.  The subsequent Level I Warning/Exclusion stated that Plaintiff's "presence on campus presents a concern to the campus community and is disruptive."  For that reason, Mr. Profita was required to:

---

[29]On a motion for summary judgment, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

> notify the [Anschutz Medical Campus] Police Department . . . any time you plan
> to come to campus for medical treatment.  You will traverse directly to and from
> your provider.  You are also advised that you are not to contact any of the faculty
> in person, by phone, by mail, or by e-mail."

*See* Exhibit K (doc. #93-11), attached to Defendant's Motion for Summary Judgment.  On July

8, 2013, Chief Abraham rescinded the Level I Warning/Exclusion and, in a separate email, told

Mr. Profita he was "permitted on campus without notifying the police."  *See* Exhibit M (doc.

#93-13), attached to Defendant's Motion for Summary Judgment.  However, Mr. Profita was

told that he should continue to communicate with Mr. Puckett before "contacting individuals

regarding your application."[30]

Chief Abraham's letter of July 8, 2013 refers to the "Level 1 Exclusionary Order" issued

to Mr. Profita on June 24, 2013.  The phrase "Exclusionary Order" seems to overstate the

limitations imposed on June 24, 2013.  The Level I Warning/Exclusion specifically recognized

that Mr. Profita could come on campus for purposes of medical treatment, subject to providing

prior notification to the University Police Department.  Indeed, Plaintiff was warned on June 24,

2013 that "further violations by you, *may result in your exclusion from campus* as determined by

---

[30]In point of fact, Mr. Profita has not provided this court with a copy of any actual
application for admission to the School of Medicine that he submitted on or after May 16, 2013.
In the Complaint he filed in *Profita v. Regents of the University of Colorado*, Mr. Profita alleged
that on September 26, 2016, he hand-delivered a letter to school officials requesting "the
reasonable accommodation . . . of readmitting me to the M.D. program . . . with reinsertion into
the program at the point of entering the Internal Medicine and Women's Care clinical
clerkships."  That request for accommodation was denied on October 14, 2016.  In the same
letter, Mr. Profita was advised that "School of Medicine policy requires students who are
dismissed form [sic] the School of Medicine to reapply as a new student through the Medical
School Admissions Committee . . . ."  *See* Exhibit 10 (doc. #107-10, at ¶¶ 39, 52 and 54),
attached to Plaintiff's Response to Defendant's Motion for Summary Judgment.

the Chancellor of the University of Colorado Denver or his or her designees."[31]  *See* Exhibit K

(doc. #93-11) (emphasis added), attached to Defendant's Motion for Summary Judgment.  As a

practical matter, the Level I Warning/Exclusion did not substantially expand upon the

restrictions previously set forth in Mr. Puckett's May 16, 2013 email.

As explained earlier in this Recommendation, when a defendant moves for summary

judgment based on the doctrine of qualified immunity, "special rules" apply.  *See Reynolds*, 370

F.3d at 1030.  Mr. Profita bears the initial "heavy" burden of showing that the Level I

Warning/Exclusion (regardless of Mr. Puckett's actions, whatever they might have been)[32]

violated a constitutional right that was "clearly established" at the time of the conduct at issue.

*Id.*  Only after Mr. Profita satisfies those two requirements does Mr. Puckett assume the

traditional burden to show an absence of genuine issues of material fact and that he is entitled to

judgment as a matter of law.  Even assuming that Mr. Profita could prove by a preponderance of

the evidence that Mr. Puckett personally issued or personally directed the University Police

Department to issue the Level I Warning/Exclusion, Mr. Profita still must first meet his burden

under the qualified immunity doctrine.  Therein lies the rub for Mr. Profita.

Once again, Plaintiff's due process claims and his singular reliance on the Colorado

---

[31]The Level I Warning/Exclusion form also indicated that if Mr. Profita was actually
excluded from campus, he could submit an appeal to the Chancellor of the University of
Colorado Denver.

[32]"Only disputes over facts that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."  *Stone v. Autoliv ASP, Inc.*, 210
F.3d 1132, 1136 (10th Cir. 2000).  *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere
existence of *some* alleged factual dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment; the requirement is that there is no *genuine*
issue of *material* fact.") (emphasis in original).

Supreme Court's decision in *Watson* will not suffice under the qualified immunity doctrine. Mr. Profita, given his status as a member of the general public, has not come forward with facts that present a colorable property or liberty interest that might have been infringed with the issuance of the June 24, 2013 Level I Warning/Exclusion. Moreover, Plaintiff has not directed the court to any Supreme Court or Tenth Circuit precedent that addresses a plaintiff's due process rights under circumstances that bear any resemblance to the particular facts of this case. In the end, to defeat Defendant's defense of qualified immunity, Mr. Profita must point to "existing precedent . . . [that] place[s] the statutory or constitutional question beyond debate." *See Pompeo*, 2017 WL 1149501, at *5 (quoting *Mullenix v. Luna*, __ U.S. __, 136 S.Ct. 305, 308 (2015)). I find that Mr. Profita has not sustained that burden.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citations omitted).

> "Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to the legality of their actions." "[T]he purpose of the qualified immunity doctrine is to provide ample room for mistaken judgments and to protect 'all but the plainly incompetent or those who knowingly violate the law.'"

*Dupree v. City of Jacksonville*, No.4:08CV00327 JMM, 2009 WL 1392578, at *6 (E.D. Ark. May 13, 2009) (internal citation omitted). In light of the undisputed facts and prevailing case law, I conclude that the restrictions on Mr. Profita's access to the Anschutz Medical Campus and the School of Medicine's faculty were objectively reasonable and did not rise to the level of a constitutional violation. Plaintiff's evidence, even when viewed most favorably, does not

demonstrate a triable due process claim. Accordingly, I recommend entry of judgment in favor of Defendant Puckett on Mr. Profita's second claim for relief.

     E.     <u>Plaintiff's Third Claim for Relief</u>

Mr. Profita's third claim challenging "The Unlawful Prohibition of Profita from Contact with Public Employees and Officials from the University of Colorado and the University of Colorado School of Medicine" is, to some extent, duplicative of his second claim. So, for example, Mr. Profita alleges in paragraphs 104-107 of the Complaint that he has various constitutionally protected "liberty and property interests" and more particularly a "constitutionally protected right to due process pertaining to the deprivation of his property and liberty interests and rights." Although it does not specifically reference the First Amendment, the third claim invokes a constitutionally protected right in communication and participation, as well as a constitutional right of access to communicate and participate with faculty, staff and administrators at the Anschutz Medical Campus. In addition, the third claim alleges that Defendant Puckett infringed upon Plaintiff's constitutionally protected right "in having access to contact the public officials and faculty available to the general public."[33] I will presume that the third claim for relief alleges an infringement on Plaintiff's constitutionally protected freedom of association.[34] As to this claim, Defendant Puckett once again invokes the doctrine of qualified

---

[33]Plaintiff's Response to Defendant's Motion for Summary Judgment explains that "Mr. Puckett's issued restrictions violated [Mr. Profita's] First Amendment Protections and Rights, specifically those related to Freedom of Association." *See* Plaintiff's Response, at 14.

[34]The First Amendment and related judicial precedent make clear that a governmental entity "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Browne v. City of Grand Junction*, 136 F. Supp. 3d 1276, 1287 (D. Colo. 2015) (quoting *Reed v. Town of Gilbert, Arizona*, __ U.S. __, 135 S. Ct. 2218, 2226 (2015)). The Complaint and Mr. Profita's briefing do not cite any facts that would show, or even suggest, that

immunity.

The record shows that as of May 16, 2013, Plaintiff was no longer enrolled as a student in the School of Medicine, but was still actively engaged in litigation against the University of Colorado. Although Mr. Puckett's email precluded Mr. Profita from directly contacting faculty "in person, mail, or by e-mail"[35] and instructed Plaintiff to "work through" University Counsel to

---

the May 16, 2013 email and the Level I Warning/Exclusion were issued based on the content of Plaintiff's speech. Indeed, the Class I Warning/Exclusion appears to be content-neutral. *Cf. Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 65-66 (2006) (rejecting the view that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea") (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

[35]As the Tenth Circuit acknowledged in *Fields v. City of Tulsa*, 753 F.3d 1000, 1012 (10th Cir. 2014), "[f]reedom of association . . . plainly presupposes a freedom not to associate." In that regard, during his deposition on December 8, 2016, Mr. Profita was asked about his prior litigation against the University of Colorado.

> Q. Mr. Profita, you have accused various members of the faculty of the University of Colorado School of Medicine of perjury, have you not?
>
> A. I have, yes.
>
> Q. You understand that those are very serious charges, don't you?
>
> A. I do.
>
> Q. What is your belief as to the willingness of anybody at the University of Colorado School of Medicine to re-engage with you?
>
> A. I have no information pertaining to that.
>
>                   * * *
>
> Q. Is it your belief that there are people in the University of Colorado School of Medicine, faculty or administration, who wanted to continue to have communications with you but who were denied that opportunity by Chris Puckett?
>
> A. I cannot speak to that.

arrange faculty contacts unrelated to receiving medical treatment, he was not restricted in any way from contacting former classmates[36] or non-faculty personnel. The Level I Warning/Exclusion did not appreciably expand upon the limitations set on the May 16, 2013 email.

After carefully viewing Plaintiff's briefs, both in support of his own motion for summary judgment and in opposition to Defendant's motion for summary judgment, it is clear that the legal underpinning for Mr. Profita's third claim relies almost exclusively on the Supreme Court's decision in *Roberts v. United States Jaycees*, 468 U.S. 609 (1984).[37] Drawing on selective passages from that decision, Mr. Profita insists that Defendant Puckett's actions infringed upon his constitutionally protected right of association because he has "substantial contacts and interests, educationally, economically, and socially" with "faculty and staff associated with the Anschutz Medical Campus." *See, e.g.,* Plaintiff's Response, at 15. Mr. Profita's reliance on

*See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita at pp. 95:19-25, 96:1-4, 96:22-25, and 97:1-2), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

[36]Plaintiff testified that since his termination from the School of Medicine, he had "not extensively" stayed in touch with any of his former classmates and had limited those contacts to various social networking sites and "occasional calls over the years." Mr. Profita did not really consider any of those former classmates to be personal friends. *See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita, at p. 52:7-17), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

[37]Mr. Profita also made a passing reference to *Fields v. City of Tulsa*, 753 F.3d 1000 (10th Cir. 2014) in his Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment. In that factually distinguishable case, the Tenth Circuit acknowledged the First Amendment protections articulated in *Roberts,* but held that the plaintiff had not shown any impairment of his freedom of association, or that he had been prevented from engaging in any association. *But see McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 910-11 (10th Cir. 2002) (in finding that the plaintiffs had failed to demonstrate a First Amendment association claim, the court noted that the plaintiff parents were not absolutely banned from school property and that the parents were afforded other means for communicating with the Board of Education).

*Roberts* is misplaced, at least for purposes of the qualified immunity doctrine and the facts of this case.

In *Roberts*, the Supreme Court was asked to resolve a conflict between Minnesota's "efforts to eliminate gender-based discrimination against its citizens and the constitutional freedom of association by members of a private organization." *Id.* at 612. The Supreme Court recognized that the First Amendment encompasses both a right to "intimate association" and "expressive association." The freedom of intimate association encompasses those personal relationships which "by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 619-20. In contrast, the freedom of expressive association affords "protection to collective effort on behalf of shared goals;" *i.e.,* "the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Id.* at 622. The Supreme Court recognized that while the right to associate for expressive purposes is not absolute and may be restricted to serve compelling state interests, the freedom of expressive association prevents the government from penalizing an individual because of their membership in a disfavored group, from requiring disclosure of an individual's membership in a group seeking anonymity, or interfering with the internal organization or affairs of a group. *Id.* at 622-23. *Cf. Schalk v. Gallemore*, 906 F.2d 491, 497-98 (10th Cir. 1990) (citing *Roberts*, 468 U.S. at 617-18).

*Roberts* and its progeny make clear that the freedom of expressive association protects the collective interests of a group whose members share common interests or objectives. *See, e.g., Dawson v. Delaware*, 503 U.S. 159, 163 (1992) (recognizing that the First Amendment

protects an individual's right to associate with others holding similar views) and *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) ("To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.' The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.").

> "[F]reedom of speech" means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. * * * [W]e do not think the Constitution recognizes a generalized right of "social association[.]"

*City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). *Cf. Pi Lambda Phi Fraternity v. Univ. of Pittsburgh*, 229 F.3d 435, 447 (3rd Cir. 2000) (in upholding the ruling granting defendant's summary judgment motion, held that the banned fraternity members' "expressive rights were inhibited by a state sanction of activities that themselves had no protected expressive element and were entirely unrelated to the Chapter members' expressive activities;" any effect on the plaintiff's expressive rights was indirect and did not rise to the level of unconstitutional infringement of the right of expressive association). *Cf. Smith v. Cal. Bd. of Educ.*, No. 13-5395 FMO (PJW), 2014 WL 5846990, at *3 (C.D. Cal. Nov. 10, 2014) (in dismissing the plaintiff's freedom of association claim, the court noted that Mr. Smith had not "alleged that he was part of a group or even wanted to be part of a group that was prevented from pursuing its goals;" to state a viable First Amendment claim, "a plaintiff must allege that he was a member of a group that was harmed by a defendant's conduct"); *Day v. Bd. of Regents of the Univ. of Neb.*, 911 F. Supp. 1228, 1238 (D. Neb. 1995) ("Freedom of association . . . involves 'a right to join with others to

pursue goals independently protected by the [F]irst Amendment.' 'Assuming an association is found, therefore, any activity that would merit First Amendment protection if engaged in outside the context of the association will suffice to constitute a right of association.'"), *aff'd*, 83 F.3d 1040 (8th Cir. 1996).

To prevail on his third claim for relief, Mr. Profita must show more than an abstract desire to associate with other, unnamed individuals. Here, the record shows that Mr. Profita was not seeking an "association" so much as dialogue with specific members of the School of Medicine's faculty and administration. *Cf. Schalk*, 906 F.2d at 498 (observing that "the 'association' that [plaintiff] seeks is nothing more or less than an audience for her speech").

Mr. Profita mentioned during his deposition his desire to maintain communications with individuals at the School of Medicine.

Q.     Who are the people with whom you wanted to continue to have communications after your lawsuit was over?

A.     Those involved in the department of neurology; those involved in the department of psychiatry; those involved in the department of neurosurgery primarily.

Q.     Who are those people?

A.     Oh, the names I will have to provide later given that they are all rather unique.

*   *   *

Q.     Is it your testimony that there were faculty members of the neurosurgery department who wanted to have you continue your education through the school of medicine after your lawsuit against the school of medicine had been concluded?

A.     Well, I have no information to speak to that, as I was never actually provided the opportunity to actually inquire that of them.

*   *   *

Q.      Is there any other opportunity that you claim you lost as a result of any actions of Mr. Puckett?

A.      Not that is coming to mind at the moment.

*See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita at pp. 97:3-11 and 20-25, 98:1-2, and 99:17-19), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.  Any "association" Mr. Profita might have had or wished to have with faculty members, outside the context of medical treatment, after January 3, 2013, was simply too attenuated or ill-defined to fall within the First Amendment's right to freedom of association.

Mr. Profita acknowledged during his deposition that he never indicated to Mr. Puckett a desire to work on campus and never asked permission to work with any of his former faculty members.  *Id.* at p. 127:9-20.  Plaintiff admitted that after June 12, 2013, he contacted Mr. Puckett to arrange meetings with Dean Krugman of the School of Medicine,[38] the Chancellor, and someone from admissions.  He was informed that the Dean and Chancellor would not agree to those requested meetings.[39]  As for his stated desire to reapply to the School of Medicine, Mr. Puckett proposed "because of [Plaintiff's] previous relationship with the School of Medicine and in an attempt to move forward productively," that if Mr. Profita had

---

[38]Apparently, in June 2013, Mr. Profita wished to discuss with Dean Krugman "some of the issues pertaining to the allegations made" regarding his conduct as a medical student and the evaluations that figured prominently in the Adams County District Court lawsuit.  *See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita at pp. 147:23-25 and 148:1-23), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

[39]In July 2013, Mr. Profita's appeal from the judgment entered by the Adams County District Court was still pending.  *See* Exhibit I (doc. 112-9) (Deposition Transcript of Taylor Profita at pp. 144:20-25 and 145:1-3), attached to Defendant's Response to Plaintiff's Motion for Summary Judgment.

> a list of questions you would like answered, please forward those to me. I will then work with someone in student life, in the Admissions area, to find the answers and then schedule a time when you, me, Dean Garrity, and someone from admissions can discuss the answers on the phone.

*Id.* at p. 143:15-21. However, at that time Mr. Profita was not inclined to participate in a meeting that included Mr. Puckett or any other representative from the University Counsel's office. *Id.* at p. 144:1-14.

Even assuming, *arguendo*, that Mr. Profita had presented facts establishing that he was engaged in a constitutionally protected expressive association during the relevant time period, his First Amendment right was not unlimited. After January 3, 2013, Mr. Profita shared the same right of access to the Anschutz Medical Campus as any other non-student member of the general public. A public university has the authority to establish "reasonable time, place, and manner regulations relating to the exercise of First Amendment rights." *Widmar v. Vincent*, 454 U.S. 263, 276 (1981). "We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." *Id.* at 267, n. 5. As Justice Stevens further explained in a concurring opinion, while a university may be operated by public authorities, "[n]evertheless, [the university's] facilities are not open to the public in the same way that streets and parks are. University facilities – private or public – are maintained for the benefit of the student body and the faculty." *Id.* at 278. *Cf. Hershey v. Goldstein*, 938 F. Supp. 2d 491, 510 (S.D.N.Y. 2013) ("[i]n striving to fulfill its educational mission, a public university has a strong interest in 'preserving its limited facilities and resources for its [many] students, its faculty, and its employees;" the manner in which a public university "decides to limit outsider access to campus deserves appropriate deference"). In that regard, "[a]ssociational activities need not be

tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Healy v. James*, 408 U.S. 169, 189 (1972).[40] *Cf. Picray v. Graves*, No. 6:11-6147-AA, 2012 WL 2054153, at *15 (D. Or. Jun. 4, 2012) (holding that a university alumnus and terminated employee of an on-campus third-party contractor was not deprived of his First Amendment rights by being banned from campus in the wake of complaints that his conduct was intimidating former co-workers and making them uncomfortable; the campus ban "did not violate plaintiff's clearly established First Amendment rights of which a reasonable university official would have known"), *aff'd,* 544 F. App'x 743 (9th Cir. 2013). I find that the restrictions set forth in Mr. Puckett's email of May 16, 2013 and the Level I Warning/Exclusion issued on June 24, 2013 were reasonable in light of Mr. Profita's ongoing litigation, his accusations of perjury against certain faculty members, and his interactions with the School of Medicine after January 3, 2013.

In sum, I conclude that Mr. Profita has not sustained his burden under the qualified immunity defense. Plaintiff has not cited this court to any Supreme Court or Tenth Circuit precedents that so broadly construe the First Amendment's freedom of expressive association as to encompass facts bearing any close resemblance to the circumstances of this case. More

---

[40]"[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Banuelos v. Martinez*, No. 1:15-cv-00010-AWI-GSA, 2015 WL 3660261, at *2 (E.D. Cal. Jun. 11, 2015) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985) and *Greer v. Spock*, 424 U.S. 828, 836 (1976)). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800. It also bears noting that the "First Amendment right to petition" does not equate to a right to "compel government officials to act on or adopt a citizen's views." *Banuelos*, 2015 WL 3660261, at *2.

importantly, for purposes of Defendant's claim of qualified immunity, Mr. Profita has not identified any controlling Supreme Court or Tenth Circuit precedents that would have put a "reasonable university official or decision-maker" in Defendant Puckett's position on notice as of June 24, 2013 that the Level I Warning/Exclusion would violate Mr. Profita's First Amendment right of expressive association.

For the foregoing reasons, this court recommends that Defendant's Motion for Summary Judgment be granted and that judgment in this matter enter in favor of Defendant Puckett as to each and every claim asserted in the Complaint.

## II.      *Plaintiff's Motion for Summary Judgment*

The analysis underpinning the court's consideration of Defendant Puckett's Motion for Summary Judgment also highlights the factual and legal flaws in Mr. Profita's Motion for Summary Judgment.  In view of the court's recommendation that judgment enter in favor of Defendant as to each of Plaintiff's three claims for relief, I conclude that Mr. Profita's motion should be denied.

## III.     *Plaintiff's Motion to Quash Subpoenas*

Mr. Profita's motion to quash the subpoenas at issue becomes moot in light of the Recommendations on the parties' respective motions for summary judgment.  If the district court does not adopt those Recommendations, in whole or in part, the information sought by these subpoenas may be relevant and properly discoverable.  Under those circumstances, and in the event Defendant serves new subpoenas on those same individuals, Mr. Profita may file a new motion to quash.

*IV.     Plaintiffs Motion for the Immediate Recusal of Magistrate Judge Shaffer*

On April 3, 2017, Mr. Profita filed a wide-ranging submission (doc. #127) that requests, *inter alia*, an order "for the immediate recusal of Magistrate Shaffer." That "Motion . . . for the Immediate Recusal of Magistrate Shaffer" was referred to me by the district judge on April 20, 2017. Although Defendant Puckett has not filed a response brief, I conclude that the issues raised by this "Motion" would not benefit from additional briefing. More importantly, I believe that Mr. Profita is entitled to a prompt and comprehensive ruling given the contemporaneous docketing of my Recommendations.

In moving for my recusal, Mr. Profita focuses on rulings that this court made in connection with prior motions filed by the parties. First, Mr. Profita contends that I improperly denied his Motion to Vacate Defendant's Motion for Summary Judgment (doc. #122) during a hearing on March 28, 2017. Second, Plaintiff maintains that my decision to award the University of Colorado sanctions pursuant to Fed. R. Civ. P. 45(d)(1) was knowingly "predicated on a fraudulent time-billing summary and exceeds any standard of reasonability." Given those rulings, Plaintiff asserts that "Magistrate Shaffer cannot or will not act impartially as an adjudicator" and has "a significant bias which cannot be ignored." Mr. Profita insists that he "cannot reasonably rely on the court for justified relief while [Magistrate Judge Shaffer] is involved in any way."

The instant motion for recusal references, without further analysis, 28 U.S.C. § 455(a) and (b). *See* Plaintiff's Objection and Appeal (doc. #127), at 12. As Mr. Profita correctly notes, § 455(a) states that a "judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Under that provision,

a judge must disqualify himself if "a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Hinman v. Rogers*, 831 F.2d 937, 938 (10th Cir. 1987). Moreover, a judicial officer shall recuse himself from a case "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *See* 28 U.S.C. § 455(b)(1).[41] Section 455(b) differs from subsection (a) in that it narrows the scope of recusal from actions where there may be the appearance of partiality, to those where there is a showing of actual bias or prejudice. *See Nichols v. Alley*, 71 F.3d 347, 350 n. 1 (10th Cir. 1995). Decisions on recusal are "committed to the sound discretion of the judge," and "[t]here is as much obligation for the judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Hinman*, 831 F.2d at 938-39.

Unquestionably, "a judge has a continuing duty to recuse before, during, or in some circumstances, after a proceeding, if the judge concludes that sufficient *factual grounds* exist to cause an objective observer reasonably to question the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993) (emphasis added). That said,

> [t]he ordinary processes of litigation require a judge to remain on a case unless he must disqualify himself irrespective of subjective evaluation based on an objective standard set forth by statute. These grounds do not include alleged errors in rulings even when the ruling is such as to amount to a denial of a constitutional right. The remedy is review of the judge's decision, not replacement of the judge.

*Maynard v. Colo. Supreme Court Office of Attorney Regulation*, No. 09-cv-2052-JLK-MEH,

---

[41] Section 455(b) also mandates that recusal must occur in other specifically enumerated circumstances. *See* 28 U.S.C. § 455(b)(2)-(5). As Mr. Profita has not raised such allegations, this court will not address those sections of the statute.

2011 WL 1532049, at *5-6 (D. Colo. Apr. 21, 2011) (quoting *In re Winslow*, 107 B.R. 752, 754 (D. Colo. 1989)).

Section 455 broadly addresses claims of bias and prejudice. *Glass v. Pfeffer*, 849 F.2d 1261, 1268 (10th Cir. 1988). Recusal, however, is not required based "upon the merest unsubstantiated suggestion of personal bias or prejudice," and the statute is not "intended to bestow veto power over judges or to be used as a judge shopping device." *Nichols*, 71 F.3d at 351. *See also Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir. 1986).

Adverse or unfavorable judicial rulings "do not in themselves call into question the impartiality of a judge." *Webb v. Swensen*, No. 16-4103, 663 F. App'x 609, 615 (10th Cir. 2016). Moreover, "judicial remarks 'that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *Patterson v. Santini*, No. 11-cv-01899-RM-KLM, 2016 WL 363783, at *3 (D. Colo. Jan. 29, 2016) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)). *See also In re Brown*, 551 F. App'x 620, 622 (3rd Cir. 2014), *rehearing denied* (Jan. 30, 2014) (explicit or implicit criticism, as well as critical or disapproving comments by the court do not, standing alone, provide a basis for recusal). Considering the foregoing legal standards, I do not believe that Mr. Profita's recent motion demonstrates actual or even potential bias on the part of this magistrate judge, or any basis from which a reasonable person would question my impartiality.

A.    Plaintiff's Motion to Vacate Defendant's Motion for Summary Judgment

Mr. Profita's motion to recuse is simply the latest manifestation of his attack on Mr. Puckett's disavowal of any involvement in the issuance of the June 24, 2013 Level I Warning/Exclusion (both in his Answer to the Complaint and his affidavit). As discussed at

some length in the foregoing Recommendations, although Mr. Puckett's position is supported by the affidavits provided by Ms. Whitten and Chief Abraham, Mr. Profita insists those accounts are contradicted by the University's own records. Accordingly, Plaintiff contends that the "false affidavits" represent more than a mere credibility dispute, but rather constitute "a fraud upon the court within the very definition of the concept."[42] Because this court takes a contrary view, Mr. Profita concludes that I must be biased.[43]

To provide context for Mr. Profita's demand for my recusal, a brief review of his prior motions is appropriate. On December 2, 2016, Plaintiff filed a Motion for Sanctions (doc. #55) pursuant to Fed. R. Civ. 11 and the court's inherent powers. That motion argued that Defendant Puckett's Answer was replete with "willful" misrepresentations concerning the events of June 12, 2013. More specifically, Mr. Profita insisted that Mr. Puckett's responses to certain allegations were contradicted by University records. The certificate of service appended to

---

[42]Mr. Profita's motion quotes isolated passages from *Bulloch v. United States*, 763 F.2d 1115 (10th Cir. 1985) and *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259 (10th Cir. 1995) as support for his "fraud on the court" contention. Neither case provides a legal basis for finding that Defendant Puckett perpetrated a fraud on the court or corrupted "the impartial functions of the court." Mr. Profita conspicuously ignores the *Bulloch* court's acknowledgment that "fraud on the court . . . is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Bulloch*, 763 F.2d at 1121. Moreover, "'fraud on the court' requires an intent to deceive or defraud the court." The court in *Robinson*, 56 F.3d at 1267, upheld the trial court and found no abuse of discretion where there was "no evidence that defendants' counsel was involved in a 'deliberately planned and carefully executed scheme' to defraud this court through misrepresentations and nondisclosure."

[43]Unbeknownst to Mr. Profita, my Recommendations do not find in favor of Defendant's argument that he did not personally participate in the issuance of the June 24, 2013 Level I Warning/Exclusion. I recognized that Ms. Whitten's Significant Incident Report and the reference to Mr. Puckett contained therein is susceptible to more than one interpretation. I also re-affirmed the court's obligation under Rule 56 to construe the record in a light most favorable to Mr. Profita and declined to express any views on the credibility of any witness.

Plaintiff's motion indicated that it had been sent electronically to defense counsel on December 2, 2016. In view of that representation, on December 6, 2016, this court denied without prejudice Plaintiff's Motion for Sanctions for failure to comply with Rule 11(c)(2), which provides that a motion may not be filed with the court until at least 21 days after being served on an opposing party.

Mr. Profita re-filed his Motion for Sanctions (doc. #75) on January 16, 2017. After a passing reference to Rule 11 and two Tenth Circuit decisions addressing the court's inherent power to impose sanctions, Mr. Profita raised the same challenges to Mr. Puckett's Answer. Plaintiff asked that the court deem certain allegations in the Complaint to be admitted, that the court "render a default judgment against Mr. Puckett on all issues," and impose monetary sanctions. Defendant Puckett filed a Response (doc. #94) on February 6, 2017 which explained at length why the responses in his Answer were not misrepresentations and were factually supported.

This court addressed Mr. Profita's second Motion for Sanctions during a hearing on February 10, 2017. *See* Transcript of Proceedings on February 10, 2017 (doc. #125). After hearing from both sides, I denied Mr. Profita's motion in a ruling from the bench that referenced several reported decisions. As I explained to Plaintiff, "[y]ou're fighting with Mr. Puckett about what it means to issue something. And that's a factual dispute." *Id.* at 11. My comments from the bench acknowledged that "Rule 11 is meant to penalize a lawyer for irresponsible and abusive tactics;" it "is not an appropriate vehicle for resolving legal or factual disputes." *Id.* at 16. In concluding my ruling, I told Mr. Profita that his motion "essentially asks this court to take [your] side on factual disputes."

> Your motion for sanctions has to be denied because its not based on law or fact. It's based upon your personal belief. . . . . [Y]ou have a personal belief that you're absolutely convinced is correct. And the simple truth is [defense counsel] and Mr. Puckett disagree with you. That's what trials are about. And not only is your . . . motion weakly supported, but when I look at the relief you're asking for, you are essentially asking . . . me to impose a sanction that effectively declares you the winner. How could I ever do that?

*Id.* at 18-19. On February 27, 2017, Mr. Profita filed his Objections to Magistrate Shaffer's Recommendations Pertaining to Plaintiff's Motion for Sanctions (doc. #110), which remains pending before the district court.

On March 13, 2017, Plaintiff filed a Motion to Vacate Defendant's Motion for Summary Judgment, to Hold Defendant in Contempt and Other Relief that the Court Deems Proper (doc. #122). After quoting Fed. R. Civ. P. 56(h), Mr. Profita argued that defense counsel had submitted in bad faith affidavits from Defendant Puckett, Ms. Whitten, and Chief Abraham that were contradicted by other records. Mr. Profita insisted that "this court must acknowledge the fact that Mr. Puckett has made numerous misrepresentations to the court." Indeed, Mr. Profita insisted that "these affidavits are so absurd, there can be no other conclusion." Notably, Mr. Profita's motion cited no case law construing Rule 56(h). Nevertheless, his motion asked the court to vacate Defendant's Motion for Summary Judgment and the disputed affidavits, that the court hold Mr. Puckett in contempt, enter judgment "in favor of Profita on all issues alleged in his complaint," and award Plaintiff "expenses, fees, and costs." I denied this motion in a ruling from the bench on March 28, 2017, noting that the factual dispute as to who issued the Level I Warning/Exclusion would not be material and would not preclude summary judgment, unless the Level I Warning/Exclusion resulted in a deprivation of a constitutional right.

Mr. Profita's reliance on Rule 56(h) as a basis for vacating Defendant's Motion for

Summary Judgment was completely misplaced. That conclusion would have been obvious to Mr. Profita had he researched the pertinent case law and analyzed the legal issues with some degree of objectivity. Rule 56(h) states that the court may award "reasonable expenses, including attorney's fees," may hold "an offending party or attorney" in contempt, or impose "other appropriate sanctions" "if [the court is ] satisfied that an affidavit or declaration under [Rule 56] is submitted in bad faith or solely for delay." *See Masterson v. Killen*, No.1:11-cv-01179-DAD-SAB (PC), 2017 WL 892761, at *2 (E.D. Cal. Mar. 7, 2017) ("Bad faith in the context of Rule 56(h) requires a deliberate or knowing act for an improper purpose."); *DeLorme v. Markwitz*, No. 14-CV-6104-FPG, 2017 WL 512617, at *3 (W.D.N.Y. Feb. 8, 2017) (for purposes of Rule 56(h), "'bad faith' is only found . . . 'when the attorney's conduct is egregious, such as where affidavits contain perjurious or blatantly false allegations or omitted facts concerning issues central to the resolution of the case.'"). The accompanying Advisory Committee Note acknowledges that sanctions under Rule 56(h) are "made discretionary, not mandatory, reflecting the experience that courts seldom involve the independent Rule 56 authority to impose sanctions." "[T]he Court 'has wide discretion in deciding what constitutes 'bad faith.'" *Nationwide Mut. Fire Ins. Co. v. D.R. Horton, Inc.*, No. 15-351-CG-N, 2016 WL 6828206, at *4 (S.D. Ala. Nov. 18, 2016).

Mr. Profita's repeated attacks on Defendant Puckett's account and supporting affidavits is not unlike the circumstances in *Shaffer v. Maddox*, CV 314-070, 2016 WL 4033220, at *3 (S.D. Ga. Jul. 27, 2016). In that case, the court noted the plaintiff's

> pattern and practice . . . to attribute bad faith and/or misconduct based on his disagreement with [defendants'] interpretation of the facts of this case. In other words, Plaintiff wholeheartedly believes he is correct about every aspect of this case and any contradictory evidence or interpretation offered by the defense

should be sanctioned as misconduct. That is not how court proceedings work.

The court in *Shaffer* noted that "any potential confusion [surrounding the disputed affidavit] is easily resolved because the actual documentation is available for the Court's review." In conclusion, the court found there '[was] no basis for concluding the affidavit was submitted in bad faith and for purposes of delay such that the imposition of discretionary sanctions would be warranted." *Cf. Grube v. Lau Indus. Inc*., 257 F.3d 723, 731 (7th Cir. 2001) (although the court noted that an affidavit submitted in support of the defendant's motion for summary judgment was contradicted by other evidence in the record, it declined to award sanctions under then Rule 56(g) because the allegedly false statement did not concern a material fact); *Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.*, 866 F.2d 11, 15-16 (1st Cir. 1989) (although plaintiff argued that the challenged affidavits were submitted in bad faith, defendants insisted the affidavits "accurately set forth the perceptions of defendants and their attorney;" the appellate court found that defendants' position "was not entirely unwarranted" and could not be said to have been made in objective bad faith); *Trujillo v. Campbell*, No. 09-cv-03011-CMA-KLM, 2012 WL 3609747, at *9 (D. Colo. Aug. 22, 2012) (although the court agreed "that it was disingenuous for Defendants to present the facts stated [in that affidavit] as 'undisputed' given the major discrepancies between the affidavit and other evidence in the record," it declined to find that the affidavit was submitted "in bad faith or solely for delay"). In my view, there is no factual basis upon which the court could grant Mr. Profita relief under Rule 56(h), and therefore, his motion to vacate was properly denied. Mr. Profita cannot persuasively demand my recusal simply because he takes exception to my ruling.

     B.    <u>The Court's Award of Attorney's Fees and Costs to the University of Colorado</u>

On March 28, 2017, this court awarded fees to the University of Colorado pursuant to Fed. R. Civ. P. 45(d)(1). The University filed a Motion for Award of Attorney's Fees (doc. #87) on February 1, 2017, following my ruling from the bench on January 20, 2017 that Mr. Profita had violated Rule 45(d)(1) by failing to "take reasonable steps to avoid imposing undue burden or expense" on non-parties subject to subpoenas that he attempted to issue.[44] I specifically found that Plaintiff's subpoenas sought information that had no relevance to the claims and defenses in this case, and unfairly burdened individuals who had no connection with the limited circumstances underlying Plaintiff's constitutional claims. I also directed the University of Colorado to submit an application for attorneys fees. The University filed that request on February 1, 2017, seeking $3,850.00, based on Mr. Temple's hourly rate of $275.00 and 14 hours of billable time. Mr. Profita subsequently filed a response, challenging the University's right to recover fees and Mr. Temple's claimed hours as excessive.

Rule 45(d)(1) requires the court to impose "appropriate sanctions" that may include lost earnings and reasonable attorney's fees. In determining whether sanctions should be imposed under Rule 45(d)(1), courts consider a number of factors, "including the person's status as a non-party, the relevance of the discovery sought, the subpoenaing party's need for the documents, the breadth of the request, and the burden imposed on the subpoenaed party." *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 188 (N.D. Ill. 2013). *Cf. EEOC v. Ford Motor Credit Co.*,

---

[44]This was Mr. Profita's second attempt to obtain documents from the University of Colorado and certain members of the administration and faculty. On November 7, 2016, this court reviewed Plaintiff's first set of subpoenas and explained to Mr. Profita the requirements of Rule 45(d)(1). During the same status conference, the court observed that Plaintiff was seeking through subpoenas information that was not relevant to the claims and defenses in this action. Based on that discussion, Mr. Profita elected to withdraw his first set of subpoenas and submit more focused discovery requests. His second set of subpoenas were not materially different.

26 F.3d 44, 47 (6th Cir. 1994) (the court must weigh "the likely relevance of the requested material . . . against the burden . . . of producing the material"). The court also must be mindful that Rule 45(d) encompasses the principles stated in Fed. R. Civ. P. 26(g). *See Builders Ass'n of Greater Chicago v. City of Chicago*, No. 96C1122, 2002 WL 1008455, at *3, 5 (N.D. Ill. May 13, 2002). *Cf. Mount Hope Church v. Bash Back!*, 705 F.3d 418, 425 (9th Cir. 2012) ("[b]ecause Rule 45[(d)](1) gives 'specific application' to Rule 26(g), it follows that a violation of any one of the Rule 26 duties will be relevant to assessing propriety of sanctions under Rule 45[(d)](1)'s 'undue burden' language").[45] Ultimately, "[d]eterminations of issues of 'undue burden' are committed to the discretion of the trial court." *Jones v. Hirschfeld*, 219 F.R.D. 71, 74 (S.D.N.Y. 2003). Having prepared two sets of subpoenas that plainly exceeded the reasonable scope of discovery in this case, and been counseled by this court on the need to comply with Rule 45(d)(1), Mr. Profita's attack on the impropriety of the University's fee application rings somewhat hollow.

On March 28, 2017, I heard this particular dispute. I informed Mr. Profita that the University was not entitled to recover fees for time that was not actually or reasonably incurred as a result of the Rule 45(d)(1) violation. Although Plaintiff might dispute the reasonableness of

---

[45]As the court noted in *Mancia v. Mayflower Textile Services, Co.*, 253 F.R.D. 354, 360 (D. Md. 2008),

> Rule 26(g) charges those responsible for the success or failure of pretrial discovery – the trial judge and lawyers for the adverse parties – with approaching the process properly: discovery must be initiated and responded to responsibly, in accordance with the letter and spirit of the discovery rules, to achieve a proper purpose (i.e., not to harass, unnecessarily delay, or impose needless expense), to be proportional to what is at issue in the litigation, and if it is not, the judge is expected to impose appropriate sanctions to punish and deter.

Mr. Temple's hours, the University's fee application did not constitute a fraud on the court.  I then explained on the record that I would deduct certain hours from the University's fee application representing the sum of $1,168.75.  After that deduction, I awarded the University of Colorado $2,681.25 in attorney's fees.  Mr. Profita now argues that I must recuse from this action because I "ignor[ed] the fraudulent time-billing summary and the fraud upon the court perpetrated by David Temple."  Once again, Mr. Profita presumes that a motion and subsequent ruling contrary to his position manifests bias on the part of the court.  Nothing could be further from the truth.

In awarding sanctions under Rule 45(d)(1), the court should determine a "lodestar amount" that reflects the number of attorney hours reasonably expended and a reasonable hourly rate.[46]  *See, e.g.*, *General Steel Domestic Sales LLC v. Chumley*, No. 13-cv-00769-MSK-KMT, 2014 WL 3057496, at *4 (D. Colo. Jul. 7, 2014) ("A party seeking an award of attorney's fees must establish the reasonableness of each dollar and each hour for which the party seeks an award.").  *Cf. XTO Energy, Inc. v. ATD*, *LLC,*, No. CIV 14-1021-JB/SCY, 2016 WL 5376322, at *7-8 (D.N.M. Aug. 22, 2016) ("To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount' of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a reasonable fee.").  While Rule 45(d)(1) permits a party to recover reasonable attorney's fees, counsel is expected to exercise billing judgment by eliminating from the fee request those hours that are excessive, redundant, or otherwise unnecessary.

---

[46]Mr. Profita has not specifically challenged the hourly rate claimed by Mr. Temple and has not proffered any evidence that would call that rate into question.

> There is no requirement . . . that district courts identify and justify each disallowed hour. Nor is there any requirement that district courts announce which hours are permitted for each legal task. Such a rule would lead to disagreement of the most odious sort between court and counsel. * * * And, such a process still would not result in a product free of dispute. To the contrary, disputes would be multiplied, violating the Supreme Court's caution that a "request for attorney's fees should not result in a second major litigation."

*Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1202-03 (10th Cir. 1986). In the final analysis, the court is required to award "reasonable" compensation, supported by a concise but clear explanation of its reasons for the fee award. *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir. 1990). I provided Mr. Profita with that concise and clear explanation during the hearing on March 28, 2017.

Notwithstanding the fact that the University's requested fees were reduced by 30%, Mr. Profita contends that I cannot or will not act impartially. Determining the amount of a fee award is left to the discretion of the court, which "is appropriate in view of the . . . court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). A court only abuses that discretion if it made a "clear error of judgment or exceeded the clear bounds of permissible choice in the circumstances." *Latham v. Marine Ins. Co.*, 16 F. App'x 834, 837 (10th Cir. 2001) (quoting *Cummins v. Campbell*, 44 F.3d 847, 854 (10th Cir. 1994)). While Mr. Profita may dispute my exercise of discretion, that challenge should be raised in an objection to the district court, not in a motion to recuse.

In sum, I do not believe Mr. Profita's motion for recusal is either factually or legally supported. I do not question, for an instant, Mr. Profita's commitment to his cause. I also absolutely respect Mr. Profita's right to challenge any rulings that I have made in this case, as

well as my Recommendations regarding the pending motions for summary judgment. However, those rulings do not present a basis for recusal. Accordingly, Plaintiff's motion to recuse is denied.

V.      *Plaintiff's Motion to Stay Proceedings Related to Defendant's Motion for Summary Judgment*

Mr. Profita contends that "all action pertaining to Defendant's Motion for Summary Judgment" should be stayed pending a hearing before the district court because Plaintiff "has a constitutional right to be heard on these issues in a meaningful manner." Apparently, Mr. Profita believes that he has been denied such a right because the hearings to date have occurred before this Magistrate Judge. While Mr. Profita is entitled to pursue his lawsuit and arguments to a fair and just conclusion, Defendant Puckett has an equal right to proceed to disposition without unnecessary delay. To the extent that Mr. Profita wishes to assert objections to this court's Recommendations and/or Orders, Fed. R. Civ. P. 72 provides an appropriate mechanism. I am at a loss to understand how Mr. Profita's requested stay will promote a "just, speedy, and inexpensive" determination of this action. For that reason, Mr. Profita's motion for stay is denied.

**CONCLUSION**

For the foregoing reasons, this court RECOMMENDS that Plaintiff Profita's Motion for Summary Judgment (doc. #95) be denied, and that Defendant Puckett's Motion for Summary Judgment (doc. #93) be granted. The court further recommends that judgment enter in favor of Defendant Puckett on all claims in the Complaint, and that Defendants John and Jane Does 1 through 100 be dismissed from this action without prejudice.

The court hereby ORDERS that Plaintiff Profita's Motion to Quash Subpoenas (doc. #81) is denied as moot, and that Plaintiff Profita's Motion for Immediate Recusal of Magistrate Shaffer (doc. #127) and Plaintiff Profita's Motion to Stay Proceedings Related to Defendant's Motion for Summary Judgment (doc. #127) are denied.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to

object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED this 25th day of April, 2017.

BY THE COURT:

*s/ Craig B. Shaffer*
United States Magistrate Judge